## THE LUSITANIA.

### Petition of CUNARD S. S. CO., Limited.

#### (District Court, S. D. New York. August 23, 1918.)

1. SHIPPING ⬤⟹207—LIMITATION OF LIABILITY—NEGLIGENCE.

In a proceeding for limitation of liability on account of the loss of the British steamship Lusitania, which was torpedoed by a German submarine without warning, *held*, that the equipment of the vessel, the navigation, and the launching of the lifeboats showed no negligence, so that passengers had no claim against the owner.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. SHIPPING ☞82—NAVIGATION—DUTY OF COMMANDING OFFICER.

It is a fundamental principle in navigating a merchantman, whether in peace or war, that the commanding officer be left free to exercise his own judgment.

3. SHIPPING ☞207—LIMITATION. OF LIABILITY—NEGLIGENCE.

In proceeding by the owners of the Lusitania, which was torpedoed by a German submarine, to limit their liability, *held* that, though the commanding officer did not exactly follow the general advices sent out by the British admiralty, he could not be deemed negligent or at fault.

4. NEGLIGENCE ☞56(1)—RECOVERY—PROXIMATE CAUSE.

It is an elementary principle of law that, even if a person is negligent, recovery cannot be had, unless the negligence is the proximate cause of the loss or damage.

5. NEGLIGENCE ☞62(3)—PROXIMATE CAUSE—INTERVENING AGENCY.

Even if negligence is shown, it cannot be deemed the proximate cause of loss or damage, if an independent illegal act of a third party intervenes to cause the loss.

6. INTERNATIONAL LAW ☞1—EFFECT—RECOGNITION IN UNITED STATES.

The United States courts recognize the binding effect of international law as an integral part of the laws of the land.

7. INTERNATIONAL LAW ☞2—SOURCES.

To ascertain international law, resort may be had to the customs and usages of civilized nations, and, as evidence of these, to the works of commentators and jurists.

8. SHIPPING ☞207—LIMITATION OF LIABILITY—SINKING OF UNARMED MERCHANTMEN WITHOUT WARNING.

The act of the German submarine commander in sinking the Lusitania, an unarmed British passenger vessel, without warning and without making any provision for the safety of passengers and crew, was illegal, being in violation of the laws of nations recognized by all civilized powers, and recognized even by Germany prior to the sinking of the Lusitania; hence the owners are in no way liable for the death of passengers.

In Admiralty. In the matter of the petition of the Cunard Steamship Company, Limited, as owner of the steamship Lusitania, for limitation of its liability. Petition granted, and claims dismissed, without costs.

Lord, Day & Lord, of New York City (J. Parker Kirlin, Lucius H. Beers, and Allan B. A. Bradley, all of New York City, of counsel), for petitioner.

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., and George C. Sprague, both of New York City, of counsel), for claimants Adams and others.

A. Gordon Murray, William H. Blymyer, Griggs, Baldwin & Baldwin, Joseph F. Collins, Foley & Martin, George V. A. McCloskey, John M. Nolan, and Sol Friedland, all of New York City, R. Emmet Digney, of White Plains, N. Y., Maurice B. Gluck, of New York City, Patrick J. Dolan, of Newark, N. J., Standish Chard, James W. Prendergast, Charles O. Maas, Raymond Ballantine, and Sidney Rossman, all of New York City, Thibodeau & Ellsworth, of Boston, Mass., and Conklin & Reid and Baldwin & Curtis, of New York City (Paul C. Whipp and Frank V. Barns, both of New York City, of counsel), for various claimants.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MAYER, District Judge. On May 1, 1915, the British passenger carrying merchantman Lusitania sailed from New York, bound for Liverpool, with 1,257 passengers and a crew of 702, making a total of 1,959 souls on board, men, women, and children. At approximately 2:10 on the afternoon of May 7, 1915, weather clear and sea smooth, without warning, the vessel was torpedoed and went down by the head in about 18 minutes, with an ultimate tragic loss of life of 1,195. Numerous suits having been begun against the Cunard Steamship Company, Limited, the owner of the vessel, this proceeding was brought in familiar form, by the steamship company, as petitioner, to obtain an adjudication as to liability, and to limit petitioner's liability to its interest in the vessel and her pending freight, should the court find any liability.

The sinking of the Lusitania was inquired into before the Wreck Commissioner's Court in London, June 15, 1915, to July 1, 1915, and the testimony then adduced, together with certain depositions taken pursuant to commissions issued out of this court and the testimony of a considerable number of passengers, crew, and experts heard before this court, constitute the record of the cause. It is fortunate, for many reasons, that such a comprehensive judicial investigation has been had; for, in addition to a mass of facts which give opportunity for a clear understanding of the case in its various aspects, the evidence presented has disposed, without question and for all time, of any false claims brought forward to justify this inexpressibly cowardly attack upon an unarmed passenger liner.

So far as equipment went, the vessel was seaworthy in the highest sense. Her carrying capacity was 2,198 passengers and a crew of about 850, or about 3,000 persons in all. She had 22 open lifeboats, capable of accommodating 1,322 persons, 26 collapsible boats, with a capacity of 1,283, making a total of 48 boats, with a capacity for 2,605 in all, or substantially in excess of the requirements of her last voyage. Her total of life belts was 3,187, or 1,959 more than the total number of passengers, and, in addition, she carried 20 life buoys. She was classed 100 A1 at Lloyd's, being 787 feet long over all, with a tonnage of 30,395 gross and 12,611 net. She had 4 turbine engines, 25 boilers, 4 boiler rooms, 12 transverse bulkheads, dividing her into 13 compartments, with a longitudinal bulkhead on either side of the ship for 425 feet, covering all vital parts.

The proof is absolute that she was not and never had been armed, nor did she carry any explosives. She did carry some 18 fuse cases and 125 shrapnel cases, consisting merely of empty shells, without any powder charge, 4,200 cases of safety cartridges, and 189 cases of infantry equipment, such as leather fittings, pouches, and the like. All these were for delivery abroad, but none of these munitions could be exploded by setting them on fire in mass or in bulk, nor by subjecting them to impact. She had been duly inspected on March 17, April 15, 16, and 17, all in 1915, and before she left New York the boat gear and boats were examined, overhauled, checked up, and defective articles properly replaced. There is no reason to doubt that this part of her equipment was in excellent order when she left New York.

The vessel was under the command of a long-service and experienced captain, and officered by competent and experienced men. The difficulties of the war prevented the company from gathering together a crew fully reaching a standard as high as in normal times (many of the younger British sailors having been called to the colors); but, all told, the crew was good, and, in many instances, highly intelligent and capable. Due precaution was taken in respect of boat drills while in port, and the testimony shows that those drills were both sufficient and efficient. Some passengers did not see any boat drills on the voyage, while others characterized the drills, in effect, as formally superficial. Any one familiar with ocean traveling knows that it is not strange that boat drills may take place unobserved by some of the passengers, who, though on deck, may be otherwise occupied, or who may be in another part of the ship, and such negative testimony must give way to the positive testimony that there were daily boat drills, the object of which mainly was to enable the men competently and quickly to lower the boats.

Each man had a badge showing the number of the boat to which he was assigned, and a boat list was posted in three different places in the ship. Each day of the voyage a drill was held with the emergency boat, which was a fixed boat, either No. 13 on the starboard side or No. 14 on the port side, according to the weather; the idea, doubtless, being to accustom the men quickly to reach the station on either side of the ship. The siren was blown and a picked crew from the watch assembled at the boat, put on life belts, jumped into the boat, took their places, and jumped out again.

Throughout this case it must always be remembered that the disaster occurred in May, 1915, and the whole subject must be approached with the knowledge and mental attitude of that time. It may be that more elaborate and effective methods and precautions have been adopted since then, but there is no testimony which shows that these boat drills, as practiced on the voyage, were not fully up to the then existing standards and practices. There can be no criticism of the bulkhead door drills, for there was one each day.

In November, 1914, the directors of the Cunard Company, in view of the falling off of the passenger traffic, decided to withdraw the Lusitania's sister ship, Mauretania, and to run the Lusitania at three-fourths boiler power, which involved a reduction of speed from an average of about 24 knots to an average of about 21 knots. The ship was operated under this reduced boiler power and reduced rate of speed for six round trips, until and including the fatal voyage, although at the reduced rate she was considerably faster than any passenger ship crossing the Atlantic at that time. This reduction was in part for financial reasons and in part "a question of economy of coal and labor in time of war." No profit was expected, and none was made; but the company continued to operate the ship as a public service. The reduction from 24 to 21 knots is, however, quite immaterial to the controversy, as will later appear.

Having thus outlined the personnel, equipment, and cargo of the vessel, reference will now be made to a series of events preceding

her sailing on May 1, 1915. On February 4, 1915, the Imperial German government issued a proclamation as follows:

**"Proclamation.**

"1. The waters surrounding Great Britain and Ireland, including the whole English Channel, are hereby declared to be war zone. On and after the 18th of February, 1915, every enemy merchant ship found in the said war zone will be destroyed without its being always possible to avert the dangers threatening the crews and passengers on that account.

"2. Even neutral ships are exposed to danger in the war zone, as in view of the misuse of neutral flags ordered on January 31 by the British government, and of the accidents of naval war, it cannot always be avoided to strike even neutral ships in attacks that are directed at enemy ships.

"3. Northward navigation around the Shetland Islands, in the eastern waters of the North Sea, and in a strip of not less than 30 miles width along the Netherlands coast is in no danger.

"Von Pohl,<br>
"Chief of the Admiral Staff of the Navy.

"Berlin, February 4, 1915."

This was accompanied by a so-called memorial, setting forth the reasons advanced by the German government in support of the issuance of this proclamation, an extract from which is as follows:

"Just as England declared the whole North Sea between Scotland and Norway to be comprised within the seat of war, so does Germany now declare the waters surrounding Great Britain and Ireland, including the whole English Channel, to be comprised within the seat of war, and will prevent by all the military means at its disposal all navigation by the enemy in those waters. To this end it will endeavor to destroy, after February 18 next, any merchant vessels of the enemy which present themselves at the seat of war above indicated, although it may not always be possible to avert the dangers which may menace persons and merchandise. Neutral powers are accordingly forewarned not to continue to intrust their crews, passengers or merchandise to such vessels."

To this proclamation and memorial the government of the United States made due protest under date of February 10, 1915. On the same day protest was made to England by this government regarding the use of the American flag by the Lusitania on its voyage through the war zone on its trip from New York to Liverpool of January 30, 1915, in response to which, on February 19, Sir Edward Grey, Secretary of State for Foreign Affairs, handed a memorandum to Mr. Page, the American ambassador to England, containing the following statement:

"It was understood that the German government had announced their intention of sinking British merchant vessels at sight by torpedoes, without giving any opportunity of making any provisions for saving the lives of noncombatant crews and passengers. It was in consequence of this threat that the Lusitania raised the United States flag on her inward voyage and on her subsequent outward voyage. A request was made by the United States passengers who were embarking on board her that the United States flag should be hoisted, presumably to insure their safety."

The British ambassador, Hon. Cecil Spring Rice, on March 1, 1915, in a communication to the American Secretary of State, regarding an economic blockade of Germany, stated in reference to the German proclamation of February 4th:

"Germany has declared that the English Channel, the north and west coasts of France, and the waters around the British Isles are a war area, and has officially notified that all enemy ships found in that area will be destroyed and that neutral vessels may be exposed to danger. This is in effect a claim to torpedo at sight, without regard to the safety of the crew or passengers, any merchant vessel under any flag. As it is not in the power of the German Admiralty to maintain any surface craft in these waters, this attack can only be delivered by submarine agency."

Beginning with the 30th of January, 1915, and prior to the sinking of the Lusitania on May 7, 1915, German submarines attacked and seemed to have sunk 20 merchant and passenger ships within about 100 miles of the usual course of the Lusitania, chased 2 other vessels, which escaped, and damaged still another.

It will be noted that nothing is stated in the German memorandum, supra, as to sinking enemy merchant vessels without warning, but, on the contrary, the implication is that settled international law as to visit and search, and an opportunity for the lives of passengers to be safeguarded, will be obeyed, "although it may not always be possible to avert the dangers which may menace persons and merchandise."

As a result of this submarine activity, the Lusitania, on its voyages from New York to Liverpool, beginning with that of January 30, 1915, steered a course further off from the south coast of Ireland than formerly. In addition, after the German proclamation of February 4, 1915, the Lusitania had its boats swung out and provisioned while passing through the danger zone, did not use its wireless for sending messages, and did not stop at the Mersey bar for a pilot, but came directly up to its berth.

The petitioner and the master of the Lusitania received certain advices from the British Admiralty on February 10, 1915, as follows:

"Instructions with Reference to Submarines—10th February, 1915.

"Vessels navigating in submarine areas should have their boats turned out and fully provisioned. The danger is greatest in the vicinity of ports and off prominent headlands on the coast. Important landfalls in this area should be made after dark whenever possible. So far as is consistent with particular trades and state of tides, vessels should make their ports at dawn."

On April 15 and 16, 1915, and after the last voyage from New York, preceding the one on which the Lusitania was torpedoed, the Cunard Company and the master of the Lusitania received at Liverpool the following advices from the British Admiralty:

"Confidential Daily Voyage Notice, 15th April, 1915, Issued under Government War Risks Scheme.

"German submarines appear to be operating chiefly off prominent headlands and landfalls. Ships should give prominent headlands a wide berth."

Confidential memo., issued April 16, 1915:

"War experience has shown that fast steamers can considerably reduce the chance of successful surprise submarine attack by zigzagging—that is to say, altering the course at short and irregular intervals, say in ten minutes to half an hour. This course is almost invariably adopted by warships, when cruising in an area known to be infested by submarines. The underwater speed of a submarine is very low, and it is exceedingly difficult for her to get into position to deliver an attack, unless she can observe and predict the course of the ship attacked."

Sir Alfred Booth, chairman of the Cunard Line, was a member of the War Risks Committee at Liverpool, consisting of shipowners, representatives of the Board of Trade and the Admiralty, which received these instructions, and passed them on to the owners of vessels, including the Cunard Company, who distributed them to the individual masters.

On Saturday, May 1, 1915, the advertised sailing date of the Lusitania from New York to Liverpool on the voyage on which she was subsequently sunk, there appeared the following advertisement in the New York Times, New York Tribune, New York Sun, New York Herald, and New York World; this advertisement being, in all instances except one, placed directly over, under, or adjacent to the advertisement of the Cunard Line regarding the sailing of the Lusitania:

"Travelers intending to embark on the Atlantic voyage are reminded that a state of war exists between Germany and her allies and Great Britain and her allies. That the zone of war includes the waters adjacent to the British Isles. That in accordance with formal notice given by the Imperial German government vessels flying the flag of Great Britain or of any of her allies are liable to destruction in those waters and that travelers sailing in the war zone on ships of Great Britain or her allies do so at their own risk.

"April 22, 1915.                                  Imperial German Embassy,
                                                      "Washington, D. C."

This was the first insertion of this advertisement, although it was dated more than a week prior to its publication. Capt. Turner, the master of the vessel, saw the advertisement or "something of the kind" before sailing and realized that the Lusitania was included in the warning. The Liverpool office of the Cunard Company was advised of the sailing and the number of passengers by cable from the New York office, but no mention was made of the above quoted advertisement. Sir Alfred Booth was informed through the press of this advertisement on either Saturday evening, May 1st, or Sunday morning, May 2d.

The significance and construction to be given to this advertisement will be discussed infra, but it is perfectly plain that the master was fully justified in sailing on the appointed day from a neutral port with many neutral and noncombatant passengers, unless he and his company were willing to yield to the attempt of the German government to terrify British shipping. No one familiar with the British character would expect that such a threat would accomplish more than to emphasize the necessity of taking every precaution, to protect life and property, which the exercise of judgment would invite. And so, as scheduled, the Lusitania sailed, undisguised, with her four funnels and a figure so familiar as to be readily discernible, not only by naval officers and mariners, but by the ocean-going public generally.

The voyage was uneventful until May 6th. On approaching the Irish coast, on May 6th, the captain ordered all the boats hanging on the davits to be swung out and lowered to the promenade deck rail, and this order was carried out under the supervision of Staff Capt. Anderson, who later went down with the ship. All bulkhead doors which were not necessary for the working of the ship were closed, and it was reported to Capt. Turner that this had been done. Lookouts were

doubled, and two extra were put forward and one on either side of the bridge; that is, there were two lookouts in the crow's nest, two in the eyes of the ship, two officers on the bridge, and a quartermaster on either side of the bridge.

Directions were given to the engine room to keep the highest steam they could possibly get on the boilers and in case the bridge rang for full speed to give as much as they possibly could. Orders were also given that ports should be kept closed. At 7:50 p. m. on May 6th the Lusitania received the following wireless message from the Admiralty at Queenstown:

"Submarines active off south coast of Ireland."

And at 7:56 the vessel asked for and received a repetition of this message. The ship was then going at a rate of 21 knots per hour. At 8:30 p. m. of the same day the following message was received from the British Admiralty:

"To All British Ships 0005:

"Take Liverpool pilot at bar and avoid headlands. Pass harbors at full speed; steer mid-channel course. Submarines off Fastnet."

At 8:32 the Admiralty received a communication to show that this message had been received by the Lusitania, and the same message was offered to the vessel seven times between midnight of May 6th and 10 a. m. of May 7th. At about 8 a. m. on the morning of May 7th, on approaching the Irish coast, the vessel encountered an intermittent fog or Scotch mist, called "banks" in seafaring language and the speed was reduced to 15 knots. Previously, the speed, according to Capt. Turner's recollection, had been reduced to 18 knots. This adjustment of speed was due to the fact that Capt. Turner wished to run the last 150 miles of the voyage in the dark, so as to make Liverpool early on the morning of May 8th, at the earliest time when he could cross the bar without a pilot.

Judging from the location of previous submarine attacks, the most dangerous waters in the Lusitania's course were from the entrance to St. George's Channel to Liverpool bar. There is no dispute as to the proposition that a vessel darkened is much safer from submarine attack at night than in the daytime, and Capt. Turner exercised proper and good judgment in planning accordingly as he approached dangerous waters. It is futile to conjecture as to what would or would not have happened had the speed been higher prior to the approach to the Irish coast, because, obviously, until then, the captain could not figure out his situation, not knowing how he might be impeded by fog or other unfavorable weather conditions.

On the morning of May 7, 1915, the ship passed about 25 or 26, and, in any event, at least 18½ miles south of Fastnet, which was not in sight. The course was then held up slightly to bring the ship closer to land, and a little before noon land was sighted, and what was thought to be Brow Head was made out. Meanwhile, between 11 a. m. and noon, the fog disappeared, the weather became clear, and the speed was increased to 18 knots. The course of the vessel was S. 87° E. mag. At 11:25 a. m. Capt. Turner received the following message:

"Submarines active in southern part of Irish Channel last heard of 20 miles south of Coningbeg Light vessel make certain Lusitania gets this."

At 12:40 p. m. the following additional wireless message from the Admiralty was received:

"Submarines 5 miles south of Cape Clear proceeding west when sighted at 10 a. m."

After picking up Brow Head, and at about 12:40 p. m., the course was altered in shore by about 30 degrees to about N. 63° or 67° E. mag., Capt. Turner did not recall which. Land was sighted which the captain thought was Galley Head, but he was not sure, and therefore held in shore. This last course was continued for an hour at a speed of 18 knots until 1:40 p. m., when the Old Head of Kinsale was sighted, and the course was then changed back to the original course of S. 87° E. mag. At 1:50 p. m. the captain started to take a four point bearing on the Old Head of Kinsale, and while thus engaged, and at about 2:10 p. m., as heretofore stated, the ship was torpedoed on the starboard side. Whether one, two, or three torpedoes were fired at the vessel cannot be determined with certainty. Two of the ship's crew were confident that a third torpedo was fired and missed the ship. While not doubting the good faith of these witnesses, the evidence is not sufficiently satisfactory to be convincing.

There was, however, an interesting and remarkable conflict of testimony as to whether the ship was struck by one or two torpedoes, and witnesses, both passengers and crew, differed on this point, conscientiously and emphatically; some witnesses for claimants and some for petitioner holding one view, and others, called by each side, holding the opposite view. The witnesses were all highly intelligent, and there is no doubt that all testified to the best of their recollection, knowledge, or impression, and in accordance with their honest conviction. The weight of the testimony (too voluminous to analyze) is in favor of the "two torpedo" contention, not only because of some convincing direct testimony (as, for instance, Adams, Lehman, Morton), but also because of the unquestioned surrounding circumstances. The deliberate character of the attack upon a vessel whose identity could not be mistaken, made easy on a bright day, and the fact that the vessel had no means of defending herself, would lead to the inference that the submarine commander would make sure of her destruction. Further, the evidence is overwhelming that there was a second explosion. The witnesses differ as to the impression which the sound of this explosion made upon them—a natural difference, due to the fact, known by common experience, that persons who hear the same explosion, even at the same time, will not only describe the sound differently, but will not agree as to the number of detonations. As there were no explosives on board, it is difficult to account for the second explosion, except on the theory that it was caused by a second torpedo. Whether the number of torpedoes was one or two is relevant, in this case, only upon the question of what effect, if any, open ports had in accelerating the sinking of the ship.

While there was much testimony and some variance as to the places where the torpedoes struck, judged by the sound or shock of the ex-

plosions, certain physical effects, especially as to smoke and blown-up débris, tend to locate the areas of impact with some approach to accuracy. From all the testimony it may be reasonably concluded that one torpedo struck on the starboard side, somewhere abreast of No. 2 boiler room, and the other, on the same side, either abreast of No. 3 boiler room, or between No. 3 and No. 4. From knowledge of the torpedoes then used by the German submarines, it is thought that they would effect a rupture of the outer hull 30 to 40 feet long and 10 to 15 feet vertically.

Cockburn, senior second engineer, was of opinion that the explosion had done a great deal of internal damage. Although the lights were out, Cockburn could hear the water coming into the engine room. Water at once entered No. 1 and No. 2 boiler rooms, a result necessarily attributable to the fact that one or both of the coal bunkers were also blown open. Thus, one torpedo flooded some or all of the coal bunkers on the starboard side of Nos. 1 and 2 boiler rooms and apparently flooded both boiler roms. The effect of the other torpedo is not entirely clear. If it struck midway between two bulkheads, it is quite likely to have done serious bulkhead injury. The Lusitania was built so as to float with two compartments open to the sea, and with more compartments open she could not stay afloat. As the side coal bunkers are regarded as compartments, the ship could not float with two boiler rooms flooded and also any adjacent bunker, and therefore the damage done by one torpedo was enough to sink the ship. To add to the difficulties, all the steam had gone as the result of the explosions, and the ship could not be controlled by her engines.

Little, senior third engineer, testified that in a few seconds after the explosion the steam pressure fell from 190 to 50 pounds; his explanation being that the main steam pipes or boilers had been carried away. The loss of control of and by the engines resulted in disability to stop the engines, with the result that the ship kept her headway until she sank. That the ship commenced to list to starboard immediately is abundantly established by many witnesses.

Some of the witnesses (Lauriat and Adams, passengers; Duncan, Bestic, and Johnson, officers) testified that the ship stopped listing to starboard and started to recover, and then listed again to starboard until she went over. This action, which is quite likely, must have resulted from the inrush of water on the port side. There can be no other adequate explanation consistent with elementary scientific knowledge; for, if the ship temporarily righted herself, it must have been because the weight of water on the two sides was equal, or nearly so. The entry of water into the port side must, of course, have been due to some rupture on that side. Such a result was entirely possible, and, indeed, probable.

The explosive force was sufficiently powerful to blow débris far above the radio wires—i. e., more than 160 feet above the water. The boiler rooms were not over 60 feet wide, and so strong a force could readily have weakened the longitudinal bulkheads on the port side, in addition to such injury as flying metal may have done. It is easy to understand, therefore, how the whole pressure of the water rushing

in from the starboard side against the weakened longitudinal bulkheads on the port side would cause them to give way, and thus open up some apertures on the port side for the entry of water. Later, when the water continued to rush in on the starboard side, the list to starboard naturally again occurred, increased, and continued to the end. As might be expected, the degree of list to starboard is variously described, but there is no doubt that it was steep and substantial.

A considerable amount of testimony was taken upon the contention of claimants that many of the ship's ports were open, thus reducing her buoyancy and substantially hastening her sinking. There is no doubt that on May 6th adequate orders were given to close all ports. The testimony is conclusive that the ports on deck F (the majority of which were dummy ports) were closed. Very few, if any, ports on E deck were open, and, if so, they were starboard ports in a small section of the first class, in the vicinity where one of the torpedoes did its damage. A very limited number of passengers testified that the portholes in their staterooms were open, and, if their impressions are correct, these portholes, concerning which they testified, were all, or nearly all, so far above the water that they could not have influenced the situation.

There was conflicting testimony as to the ports in the dining room on D deck. The weight of the testimony justifies the conclusion that some of these ports were open—how many it is impossible to determine. These ports, however, were from 23 to 30 feet above water, and when the gap made by the explosion and the consequent severe and sudden list are considered, it is plain that these open ports were not a contributing cause of the sinking and had a very trifling influence, if any, in accelerating the time within which the ship sank.

From the foregoing, the situation can be visualized. Two sudden and extraordinary explosions; the ship badly listed, so that the port side was well up in the air; the passengers scattered about on the decks and in the staterooms, saloons, and companion ways; the ship under headway, and, as it turned out, only 18 minutes afloat—such was the situation which confronted the officers, crew, and passengers in the endeavor to save the lives of those on board. The conduct of the passengers constitutes an enduring record of calm heroism, with many individual instances of sacrifice, and, in general, a marked consideration for women and children. There was no panic; but, naturally, there was a considerable amount of excitement and rush, and much confusion and, as the increasing list rendered ineffective the lowering of the boats on the port side, the passengers, as is readily understandable, crowded over on the starboard side.

[1] The problem presented to the officers of the ship was one of exceeding difficulty, occasioned largely because of the serious list and the impossibility of stopping the ship or reducing her headway. The precaution of extra lookouts resulted in a prompt report to the captain, via the bridge, of the sighting of the torpedo. Second Officer Heppert, who was on the bridge, immediately closed all water-tight doors worked from the bridge, and the testimony satisfactorily shows that all water-tight doors worked by hand were promptly closed. Immediately after Capt. Turner saw the wake of the torpedo, there was an explo-

sion, and then Turner went to the navigation bridge and took the obvious course; i. e., had the ship's head turned to the land. He signaled the engine room for full speed astern, hoping, thereby, to take the way off the ship, and then ordered the boats lowered down to the rail, and directed that women and children should be first provided for in the boats. As the engine room failed to respond to the order to go full speed astern, and as the ship was continuing under way, Turner ordered that the boats should not be lowered until the vessel should lose her headway, and he told Anderson, the staff captain, who was in charge of the port boats, to lower the boats when he thought the way was sufficiently off to allow that operation. Anderson's fidelity to duty is sufficiently exemplified by the fact that he went down with the ship.

Jones, first officer, and Lewis, acting third officer, were in charge of the boats on the starboard side, and personally superintended their handling and launching. Too much cannot be said both for their courage and skill; but, difficult as was their task, they were not confronted with some of the problems which the port side presented. There, in addition to Anderson, were Bestic, junior third officer, and another officer, presumably the second officer. These men were apparently doing the best they could and standing valiantly to their duty. Anderson's fate has already been mentioned, and Bestic, although surviving, stuck to his post until the ship went down under him. The situation can readily be pictured, even by a novice.

With the ship listed to starboard, the port boats, of course, swung inboard. If enough man power were applied, the boats could be put over the rail; but then a real danger would follow. Robertson, the ship's carpenter, aptly described that danger in answer to a question as to whether it was possible to lower the open boats on the port side. He said:

"No; to lower the port boats would just be like drawing a crate of unpacked china along a dock road. What I mean is that, if you started to lower the boats, you would be dragging them down the rough side of the ship on rivets which are what we call 'snap-headed rivets'; they stand up about an inch from the shell of the ship, so you would be dragging the whole side of the boat away if you tried to lower the boats with a 15° list."

That some boats were and others would have been seriously damaged is evidenced by the fact that two port boats were lowered to the water and got away (though one afterward filled), and not one boat reached Queenstown. Each boat has its own history (except possibly boats 2 and 4), although it is naturally difficult, in each case, to allocate all the testimony to a particular boat.

There is some testimony, given in undoubted good faith, that painted or rusted davits stuck out; but the weight of the testimony is to the contrary. There were some lamentable occurrences on the port side, which resulted in spilling passengers, some of whom, thus thrown out or injured, went to their death. These unfortunate accidents, however, were due either to lack of strength of the seaman who was lowering, or possibly, at worst, to an occasional instance of incompetency, due to the personal equation so often illustrated where one man of many may not be equal to the emergency. But the problem was of the

most vexatious character. In addition to the crowding of passengers in some instances, was this extremely hazardous feat of lowering boats swung inboard from a tilted height, heavily weighted by human beings, with the ship still under way. It cannot be said that it was negligent to attempt this, because, obviously, all the passengers could not be accommodated in the starboard boats.

On the starboard side, the problem in some respects was not so difficult, while in others troublesome conditions existed, quite different from those occurring on the port side. Here the boats swung so far out as to add to the difficulty of passengers getting in them, a difficulty intensified by the fact that many more passengers went to the starboard side than to the port side, and also that the ship maintained her way. Six boats successfully got away. In the case of the remaining boats, some were successfully lowered, but later met with some unavoidable accident, and some were not successfully launched (such as Nos. 1, 5, and 17) for entirely explainable reasons, which should not be charged to inefficiency on the part of the officers or crew.

The collapsible boats were on the deck under the open lifeboats, and were intended to be lifted and lowered by the same davits which lowered the open boats after the open boats had gotten clear of the ship. It was the duty of the officers to get the open boats away before giving attention to the collapsible boats, and that was a question of time. These boats are designed and arranged to float free if the ship should sink before they can be hoisted over. They were cut loose, and some people were saved on these boats.

It is to be expected that those passengers who lost members of their family or friends, and who saw some of the unfortunate accidents, should feel strongly and entertain the impression that inefficiency or individual negligence was widespread among the crew. Such an impression, however, does an inadvertent injustice to the great majority of the crew, who acted with that matter-of-fact courage and fidelity to duty which are traditional with men of the sea. Such of these men, presumably fairly typical of all, as testified in this court, were impressive, not only because of inherent bravery, but because of intelligence and clear-headedness, and they possessed that remarkable gift of simplicity so characteristic of truly fearless men, who cannot quite understand why an ado is made of acts which seem to them merely as, of course, in the day's work.

Mr. Grab, one of the claimants, and an experienced transatlantic traveler, concisely summed up the situation when he said:

"They were doing the best they could; they were very brave and working as hard as they could without any fear; they didn't care about themselves. It was very admirably done. While there was great confusion, they did the best they could."

It will unduly prolong a necessarily extended opinion to sift the voluminous testimony relating to this subject of the boats and the conduct of the crew, and something is sought to be made of comments of Capt. Turner, construed by some to be unfavorable, but afterwards satisfactorily supplemented and explained; but, if there were some instances of incompetency, they were very few, and the charge

of negligence in this regard cannot be successfully maintained. In arriving at this conclusion, I have not overlooked the argument, earnestly pressed, that the men were not sufficiently instructed and drilled; for I think the testimony establishes the contrary, in the light of conditions in May, 1915.

[2, 3] I now come to what seems to me the only debatable question of fact in the case; i. e., whether Capt. Turner was negligent in not literally following the Admiralty advices, and also in not taking a course different from that which he adopted. The fundamental principle in navigating a merchantman, whether in times of peace or of war, is that the commanding officer must be left free to exercise his own judgment. Safe navigation denies the proposition that the judgment and sound discretion of the captain of a vessel must be confined in a mental strait-jacket. Of course, when movements are under military control, orders must be strictly obeyed, come what may. No such situation, however, was presented either to petitioner or Capt. Turner. The vessel was not engaged in military service, nor under naval convoy. True, she was, as between the German and British governments, an enemy ship as to Germany; but she was unarmed, and a carrier of not merely noncombatants, but, among others, of many citizens of the United States, then a neutral country, at peace with all the world.

In such circumstances, the captain could not shield himself automatically against error behind a literal compliance with the general advices or instructions of the Admiralty; nor can it be supposed that the Admiralty, any more than the petitioner, expected him so to do. What was required of him was that he should seriously consider, and as far as practicable, follow the Admiralty advices, and use his best judgment as events and exigencies occurred; and if a situation arose where he believed that a course should be pursued to meet emergencies which required departure from some of the Admiralty advices as to general rules of action, then it was his duty to take such course, if in accordance with his carefully formed deliberate judgment. After a disaster has occurred, it is not difficult for the expert to show how it might have been avoided, and there is always opportunity for academic discussion as to what ought or ought not to have been done; but the true approach is to endeavor, for the moment, to possess the mind of him upon whom rested the responsibility.

Let us now see what that responsibility was and how it was dealt with. The rules of naval warfare allowed the capture, and, in some circumstances, the destruction, of an enemy merchant ship; but, at the same time, it was the accepted doctrine of all civilized nations (as will be more fully considered infra), that, as Lord Mersey put it:

"There is always an obligation first to secure the safety of the lives of those on board."

The responsibility, therefore, of Capt. Turner, in his task of bringing the ship safely to port, was to give heed, not only to general advices advanced as the outcome of experience in the then developing knowledge as to submarine warfare, but particularly to any special information which might come to him in the course of the voyage.

Realizing that, if there was a due warning, in accordance with international law, and an opportunity, within a limited time, for the passengers to leave the ship, nevertheless that the operation must be quickly done, Capt. Turner, on May 6, had taken the full precautions, such as swinging out the boats, properly provisioned, which have been heretofore described. The principal features of the Admiralty advices were (1) to give the headlands a wide berth; (2) to steer a mid-channel course; (3) to maintain as high a speed as practicable; (4) to zigzag; and (5) to make ports, if possible, at dawn, thus running the last part of the voyage at night.

The reason for the advice as to keeping off headlands was that the submarines lurked near those prominent headlands and landfalls to and from which ships were likely to go. This instruction Capt. Turner entirely followed in respect of Fastnet, which was the first point on the Irish coast which a vessel bound from New York to Liverpool would ordinarily approach closely, and, in normal times, the passing would be very near, or even inside of, Fastnet. The Lusitania passed Fastnet so far out that Capt. Turner could not see it. Whether the distance was about 25 miles, as petitioner contends, or about 18½ miles, as claimant calculates, the result is that either distance must be regarded as a wide berth in comparison with the customary navigation at that point, and, besides, nothing happened there. At 8:30 p. m. on May 6 the message had been received from the British Admiralty that submarines were off Fastnet, so that Capt. Turner, in this regard, not only followed the general advices, but the specific information, from the Admiralty.

At 11:25 a. m. on May 7 Capt. Turner received the wireless from the Admiralty plainly intended for the Lusitania, informing him that submarines (plural) were active in the southern part of the Irish Channel, and when last heard of were 20 miles south of Coningbeg Lightship. This wireless message presented acutely to the captain the problem as to the best course to pursue, always bearing in mind his determination and the desirability of getting to the Liverpool bar when it could be crossed, while the tide served and without a pilot. Further, as was stated by Sir Alfred Booth:

"The one definite instruction we did give him with regard to that was to authorize him to come up without a pilot."

The reasons for this instruction were cogent, and were concisely summed up by Sir Alfred Booth during his examination as a witness as follows:

"It was one of the points that we felt it necessary to make the captain of the Lusitania understand the importance of. The Lusitania can only cross the Liverpool bar at certain states of the tide, and we therefore warned the captain, or whoever might be captain, that we did not think it would be safe for him to arrive off the bar at such a time that he would have to wait there, because that area had been infested with submarines, and we thought, therefore, it would be wiser for him to arrange his arrival in such a way, leaving him an absolutely free hand as to how he would do it, that he could come straight up without stopping at all. The one definite instruction we did give him with regard to that was to authorize him to come up without a pilot."

The tide would be high at Liverpool bar at 6:53 on Saturday morning, May 8. Capt. Turner planned to cross the bar as much earlier than that as he could get over without stopping, while at the same time figuring on passing during the darkness the dangerous waters from the entrance of St. George's Channel to the Liverpool bar.

Having thus in mind his objective, and the time approximately when he intended to reach it, the message received at 11:25 a. m. required that he should determine whether to keep off land approximately the same distance as he was when he passed Fastnet, or to work in shore and go close to Coningbeg Lightship. He determined that the latter was the better plan, to avoid the submarines reported in mid-channel ahead of him.

When Galley Head was sighted, the course was changed so as to haul closer to the land, and this course was pursued until 1:40 p. m. at which time Capt. Turner concluded that it was necessary for him to get his bearings accurately. This he decided should be done by taking a four-point bearing, during which procedure the ship was torpedoed. It is urged that he should have taken a two-point bearing or a cross-bearing, which would have occupied less time; but if, under all the conditions which appealed to his judgment as a mariner, he had taken a different method of ascertaining his exact distance, and the result would have been inaccurate, or while engaged in taking a two-point bearing, the ship had been torpedoed, then somebody would have said he should have taken a four-point bearing. The point of the matter is that an experienced captain took the bearing he thought proper for his purposes, and to predicate negligence upon such a course is to assert that a captain is bound to guess the exact location of a hidden and puzzling danger.

Much emphasis has been placed upon the fact that the speed of the ship was 18 knots at the time of the attack, instead of 24, or, in any event, 21, knots, and upon the further fact (for such it is) that the ship was not zigzagging as frequently as the Admiralty advised, or in the sense of that advice. Upon this branch of the case much testimony was taken (some in camera, as in the Wreck Commissioners' Court), and, for reasons of public interest, the methods of successfully evading submarines will not be discussed. If it be assumed that the Admiralty advices as of May, 1915, were sound and should have been followed, then the answer to the charge of negligence is twofold: (1) That Capt. Turner, in taking a four-point bearing off the Old Head of Kinsale, was conscientiously exercising his judgment for the welfare of the ship; and (2) that it is impossible to determine whether, by zigzagging off the Old Head of Kinsale or elsewhere, the Lusitania would have escaped the German submarine or submarines.

As to the first answer, I cannot better express my conclusion than in the language of Lord Mersey:

"Capt. Turner was fully advised as to the means which, in the view of the Admiralty, were best calculated to avert the perils he was likely to encounter, and in considering the question whether he is to blame for the catastrophe in which his voyage ended I have to bear this circumstance in mind. It is certain that in some respects Capt. Turner did not follow the

advice given to him. It may be (though I seriously doubt it) that, had he done so, his ship would have reached Liverpool in safety. But the question remains: Was his conduct the conduct of a negligent or of an incompetent man? On this question I have sought the guidance of my assessors, who have rendered me invaluable assistance, and the conclusion at which I have arrived is that blame ought not to be imputed to the captain. The advice given to him, although meant for his most serious and careful consideration, was not intended to deprive him of the right to exercise his skilled judgment in the difficult questions that might arise from time to time in the navigation of his ship. His omission to follow the advice in all respects cannot fairly be attributed either to negligence or incompetence. He exercised his judgment for the best. It was the judgment of a skilled and experienced man, and although others might have acted differently, and perhaps more successfully, he ought not, in my opinion, to be blamed."

As to the second answer, it is only necessary to outline the situation in order to realize how speculative is the assertion of fault. It is plain from the radio messages of the Admiralty (May 6, 7:50 p. m., "Submarines active off south coast of Ireland;" May 6, 8:30 p. m., "Submarines off Fastnet;" the 11:25 message of May 7, supra; May 7, 11:40 a. m., "Submarines 5 miles south of Cape Clear, proceeding west when sighted at 10 a. m.")—that more than one submarine was lying in wait for the Lusitania.

A scientific education is not necessary to appreciate that it is much more difficult for a submarine successfully to hit a naval vessel than an unarmed merchant ship. The destination of a naval vessel is usually not known; that of the Lusitania was. A submarine commander, when attacking an armed vessel, knows that he, as the attacker, may and likely will also be attacked by his armed opponent. The Lusitania was as helpless in that regard as a peaceful citizen suddenly set upon by murderous assailants. There are other advantages of the naval vessel over the merchant ship, which need not be referred to.

It must be assumed that the German submarine commanders realized the obvious disadvantages which necessarily attached to the Lusitania, and, if she had evaded one submarine, who can say what might have happened five minutes later? If there was, in fact, a third torpedo fired from the Lusitania's port side, then that incident would strongly suggest that, in the immediate vicinity of the ship, there were at least two submarines. It must be remembered, also, that the Lusitania was still in the open sea, considerably distant from the places of theretofore submarine activity and comfortably well off the Old Head of Kinsale, from which point it was about 140 miles to the Scilly Islands, and that she was nearly 100 miles from the entrance to St. George's Channel, the first channel she would enter on her way to Liverpool.

No transatlantic passenger liner, and certainly none carrying American citizens, had been torpedoed up to that time. The submarines, therefore, could lay their plans with facility to destroy the vessel somewhere on the way from Fastnet to Liverpool, knowing full well the easy prey which would be afforded by an unarmed, unconvoyed, well-known merchantman, which, from every standpoint of international law, had the right to expect a warning before its peaceful pas-

sengers were sent to their death. That the attack was deliberate, and long contemplated, and intended ruthlessly to destroy human life, as well as property, can no longer be open to doubt. And when a foe employs such tactics it is idle and purely speculative to say that the action of the captain of a merchant ship, in doing or not doing something, or in taking one course and not another, was a contributing cause of disaster, or that, had the captain not done what he did, or had he done something else, then that the ship and her passengers would have evaded their assassins.

I find, therefore, as a fact, that the captain, and, hence, the petitioner, were not negligent. The importance of the cause, however, justifies the statement of another ground which effectually disposes of any question of liability.

[4] It is an elementary principle of law that, even if a person is negligent, recovery cannot be had, unless the negligence is the proximate cause of the loss or damage.

[5] There is another rule, settled by ample authority, viz. that, even if negligence is shown, it cannot be the proximate cause of the loss or damage, if an independent illegal act of a third party intervenes to cause the loss. Jarnagin v. Travelers' Protective Ass'n, 133 Fed. 892, 66 C. C. A. 622, 68 L. R. A. 499; Cole v. German Savings & Loan Soc., 124 Fed. 113, 59 C. C. A. 593, 63 L. R. A. 416. See, also, Insurance Co. v. Tweed, 7 Wall. 44, 19 L. Ed. 65; Railroad Co. v. Reeves, 10 Wall. 176, 19 L. Ed. 909; Insurance Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395; The Young America (C. C.) 31 Fed. 749; Goodlander Mill Co. v. Standard Oil Co., 63 Fed. 400, 11 C. C. A. 253, 27 L. R. A. 583.

[6-8] Claimants contend strongly that the case at bar comes within Holladay v. Kennard, 12 Wall. 254, 20 L. Ed. 390, where Mr. Justice Miller, who wrote the opinion, carefully stated that that case was not to be construed as laying down a rule different from that of Railroad Co. v. Reeves, supra. An elaborate analysis of the Holladay and other cases will not be profitable. Suffice it to say, neither that nor any other case has changed the rule of law, above stated, as to the legal import of an intervening illegal act of a third party. The question, then, is whether the act of the German submarine commander was an illegal act.

The United States courts recognize the binding force of international law. As was said by Mr. Justice Gray in The Paquete Habana, 175 U. S. 677, 700, 20 Sup. Ct. 290, 299 (44 L. Ed. 320):

"International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination."

At least, since as early as June 5, 1793, in the letter of Mr. Jefferson, Secretary of State, to the French minister, our government has recognized the law of nations as an "integral part" of the laws of the land. Moore's International Law Digest, I, p. 10; The Scotia, 14 Wall. 170, 187, 20 L. Ed. 822; The New York, 175 U. S. 187, 197, 20 Sup. Ct. 67, 44 L. Ed. 126; Kansas v. Colorado, 185 U. S. 125,

146, 22 Sup. Ct. 552, 46 L. Ed. 838; Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956. To ascertain international law:

"Resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of commentators and jurists. * * * Such works are resorted to by judicial tribunals * * * for trustworthy evidence of what the law really is." The Paquete Habana, 175 U. S. 677, 20 Sup. Ct. 290, 44 L. Ed. 320 (and authorities cited).

Let us first see the position of our government, and then ascertain whether that position has authoritative support. Mr. Lansing, in his official communication to the German government, dated June 9, 1915, stated:

"But the sinking of passenger ships involves principles of humanity which throw into the background any special circumstances of detail that may be thought to affect the cases—principles which lift it, as the Imperial German government will no doubt be quick to recognize and acknowledge, out of the class of ordinary subjects of diplomatic discussion or of international controversy. Whatever be the other facts regarding the Lusitania, the principal fact is that a great steamer, primarily and chiefly a conveyance for passengers, and carrying more than a thousand souls, who had no part or lot in the conduct of the war, was torpedoed and sunk without so much as a challenge or a warning, and that men, women, and children were sent to their death in circumstances unparalleled in modern warfare. The fact that more than one hundred American citizens were among those who perished made it the duty of the government of the United States to speak of these things, and once more, with solemn emphasis, to call the attention of the Imperial German government to the grave responsibility which the government of the United States conceives that it has incurred in this tragic occurrence, and to the indisputable principle upon which that responsibility rests. The government of the United States is contending for something much greater than mere rights of property or privileges of commerce. It is contending for nothing less high and sacred than the rights of humanity, which every government honors itself in respecting, and which no government is justified in resigning on behalf of those under its care and authority. Only her actual resistance to capture, or refusal to stop when ordered to do so for the purpose of visit, could have afforded the commander of the submarine any justification for so much as putting the lives of those on board the ship in jeopardy. This principle the government of the United States understands the explicit instructions issued on August 3, 1914, by the Imperial German Admiralty to its commanders at sea, to have recognized and embodied, as do the naval codes of all other nations, and upon it every traveler and seaman had a right to depend. It is upon this principle of humanity, as well as upon the law founded upon this principle, that the United States must stand. * * * The government of the United States cannot admit that the proclamation of a war zone from which neutral ships have been warned to keep away may be made to operate as in any degree an abbreviation of the rights either of American shipmasters or of American citizens bound on lawful errands as passengers on merchant ships of belligerent nationality. It does not understand the Imperial German government to question those rights. It understands it, also, to accept as established beyond question the principle that the lives of noncombatants cannot lawfully or rightfully be put in jeopardy by the capture or destruction of an unresisting merchantman, and to recognize the obligation to take sufficient precaution to ascertain whether a suspected merchantman is in fact of belligerent nationality, or is in fact carrying contraband of war under a neutral flag. The government of the United States, therefore, deems it reasonable to expect that the Imperial German government will adopt the measures necessary to put these principles into practice in respect of the safeguarding of American lives and American ships, and asks for assurances that this will be done." White Book of Department of State, entitled "Diplomatic Correspondence with Belligerent Governments Relating

to Neutral Rights and Duties, European War No. 2," at page 172. Printed and distributed October 21, 1915.

The German government found itself compelled ultimately to recognize the principle insisted upon by the government of the United States, for, after considerable correspondence, and on May 4, 1916 (after the Sussex had been sunk), the German government stated:

"The German submarine forces have had, in fact, orders to conduct submarine warfare in accordance with the general principles of visit and search and destruction of merchant vessels as recognized by international law; the sole exception being the conduct of warfare against the enemy trade carried on enemy freight ships that are encountered, in the war zone surrounding Great Britain. * * * The German government, guided by this idea, notifies the government of the United States that the German naval forces have received the following orders: In accordance with the general principles of visit and search and destruction of merchant vessels recognized by international law, such vessels, both within and without the area declared as naval war zone, shall not be sunk without warning and without saving human lives, unless these ships attempt to escape or offer resistance."

See Official Communication by German Foreign Office to Ambassador Gerard, May 4, 1916 (White Book No. 3 of Department of State, pp. 302, 305).

There is, of course, no doubt as to the right to make prize of an enemy ship on the high seas, and, under certain conditions, to destroy her, and equally no doubt of the obligation to safeguard the lives of all persons aboard, whether passengers or crew. Phillemore on International Law (3d Ed.) vol. 3, p. 584; Sir Sherston Baker on First Steps in International Law, p. 236; G. B. Davis on Elements of International Law, pp. 358, 359; A. Pearce Higgins on War and the Private Citizen, pp. 33, 78, referring to proceedings of Institute of International Law at Turin in 1882; Creasy on International Law, p. 562, quoting Chief Justice Cockburn in his judgment in the Geneva Arbitration; L. A. Atherby-Jones on Commerce in War, p. 529; Professor Holland's article, Naval War College, 1907, p. 82; Oppenheim on International Law (2d Ed.) vol. 2, pp. 244, 311; Taylor on International Law, p. 572; Westlake on International Law (2d Ed.) p. 309, part II; Halleck on International Law, vol. 2, pp. 15, 16; Vattel's Law of Nations (Chitty's Ed.) 362.

Two quotations from this long list may be given for convenience; one stating the rule and the other the attitude which obtains among civilized governments. Oppenheim sets forth as among violations of the rules of war:

"(12) Attack on enemy merchantmen without previous request to submit to visit."

The observation in Vattel's Law of Nations is peculiarly applicable to the case of the Lusitania:

"Let us never forget that our enemies are men. Though reduced to the disagreeable necessity of prosecuting our right by force of arms, let us not divest ourselves of that charity which connects us with all mankind. Thus shall we courageously defend our country's rights without violating those of human nature. Let our valor preserve itself from every stain of cruelty and the luster of victory will not be tarnished by inhuman and brutal actions."

In addition to the authorities supra are the regulations and practices of various governments. In 1512, Henry VIII issued instructions to the Admiral of the Fleet which accord with our understanding of modern international law. Hosack's Law of Nations, p. 168. Such has been England's course since. 22 Geo. II, c. 33, § 2, subsec. 9 (1749); British Admiralty Manual of Prize Law 188, §§ 303, 304.

Substantially the same rules were followed in the Russian and Japanese regulations, and probably in the codes or rules of many other nations. Russian Prize Regulations, March 27, 1895 (cited in Moore's Digest, vol. 7, p. 518); Japanese Prize Law of 1894, art. 22 (cited in Moore, supra, vol. 7, p. 525); Japanese Regulations, March 7, 1904 (see Takahashi's Cases on International Law during Chino-Japanese War).

The rules recognized and practiced by the United States, among other things, provide:

"(10) In the case of an enemy merchantman it may be sunk, but only if it is impossible to take it into port, and provided always that the persons on board are put in a place of safety." U. S. White Book, European War, No. 3, p. 192.

These humane principles were practiced, both in the War of 1812 and during our own war of 1861–1865. Even with all the bitterness (now happily ended and forgotten) and all the difficulties of having no port to which to send a prize, Capt. Semmes, of the Alabama, strictly observed the rule as to human life, even going so far as to release ships because he could not care for the passengers. But we are not confined to American and English precedents and practices.

While acting contrary to its official statements, yet the Imperial German government recognized the same rule as the United States, and, prior to the sinking of the Lusitania, had not announced any other rule. The war zone proclamation of February 4, 1915, contained no warning that the accepted rule of civilized naval warfare would be discarded by the German government. Indeed, after the Lusitania was sunk, the German government did not make any such claim, but, in answer to the first American note in reference to the Lusitania, the German Foreign Office, per Von Jagow, addressed to Ambassador Gerard a note, dated May 18, 1915, in which, inter alia, it is stated in connection with the sinking of the British steamer Falaba:

"In the case of the sinking of the English steamer Falaba, the commander of the German submarine had the intention of allowing passengers and crew ample opportunity to save themselves. It was not until the captain disregarded the order to lay to and took to flight, sending up rocket signals for help, that the German commander ordered the crew and passengers by signals and megaphone to leave the ship within 10 minutes. As a matter of fact he allowed them 23 minutes, and did not fire the torpedo until suspicious steamers were hurrying to the aid of the Falaba." White Book No. 2, U. S. Department of State, p. 169.

Indeed, as late as May 4, 1916, Germany did not dispute the applicability of the rule, as is evidenced by the note written to our government by Von Jagow, of the German Foreign Office, an extract from which has been quoted supra.

Further, section 116 of the German Prize Code (Huberich & Kind translation, p. 68), in force at the date of the Lusitania's destruction, conformed with the American rule.   It provided:-

"Before proceeding to a destruction of the vessel, the safety of all persons on board, and, so far as possible, their effects, is to be provided for, and all ship's papers and other evidentiary material, which, according to the views of the persons at interest, is of value for the formulation of the judgment of the prize court, are to be taken over by the commander."

Thus, when the Lusitania sailed from New York, her owner and master were justified in believing that, whatever else had theretofore happened, this simple, humane, and universally accepted principle would not be violated.   Few, at that time, would be likely to construe the warning advertisement as calling attention to more than the perils to be expected from quick disembarkation and the possible rigors of the sea, after the proper safeguarding of the lives of passengers by at least full opportunity to take to the boats.

It is, of course, easy now, in the light of many later events, added to preceding acts, to look back and say that the Cunard Line and its captain should have known that the German government would authorize or permit so shocking a breach of international law and so foul an offense, not only against an enemy, but as well against peaceful citizens of a then friendly nation.   But the unexpected character of the act was best evidenced by the horror which it excited in the minds and hearts of the American people.

The fault, therefore, must be laid upon those who are responsible for the sinking of the vessel, in the legal as well as moral sense.   It is therefore not the Cunard Line, petitioner, which must be held liable for the loss of life and property.   The cause of the sinking of the Lusitania was the illegal act of the Imperial German government, acting through its instrument, the submarine commander, and violating a cherished and humane rule observed, until this war, by even the bitterest antagonists.   As Lord Mersey said:

"The whole blame for the cruel destruction of life in this catastrophe must rest solely with those who plotted and with those who committed the crime."

But while, in this lawsuit, there may be no recovery, it is not to be doubted that the United States of America and her Allies will well remember the rights of those affected by the sinking of the Lusitania, and, when the time shall come, will see to it that reparation shall be made for one of the most indefensible acts of modern times.

The petition is granted, and the claims dismissed, without costs.

### Addendum.

The grounds upon which the decision is put render unnecessary the discussion of some other interesting questions suggested.   As to the exception to interrogatory 20, brushing aside all technical points, I am satisfied that the withheld answer relates to matters irrelevant to the issues here.   It certainly cannot be expected, in wartime, that an American court will ask for the disclosure of information deemed confidential by the British Admiralty, nor can I see any good reason for delaying a decree until some future date, when the information

may be forthcoming; for it seems to me that, no matter what other general advices of the Admiralty may have been given prior to May 7, 1915, the result of this case must be the same.