UNITED STATES v. STANDARD OIL CO. OF NEW JERSEY et al.
MARYLAND TRANSP. CO. v. UNITED STATES.    SAME v.
STANDARD OIL CO. OF NEW JERSEY et al.

(District Court, D. Maryland.   June 23, 1919.)

1. MASTER AND SERVANT ⬤⇒304—NEGLIGENCE OF SERVANT—FIRE—LIABILITY
OF MASTER.

Where a fireman on a pile driver used by his employer in the construction of a pier in a harbor threw ashes into waters visibly covered by oil, causing a fire which destroyed barges and their cargoes, the employer was liable to the owners.

2. MASTER AND SERVANT ⬤⇒319—WORK OF INDEPENDENT CONTRACTOR—CONSEQUENCES OF DANGEROUS PRACTICE—FIRE.

Where a fireman on a pile driver used by his employer in construction of a pier in a harbor threw ashes into waters visibly covered by oil, causing a fire which destroyed barges and their cargoes, the company for which the pier was constructed on a cost basis, and which was aware that ashes were thrown overboard, was liable for the consequences, though the employer doing the work was an independent contractor.

3. SALVAGE ⬤⇒34—COMPENSATION.

Although piers at which scows were lying never took fire, yet where scows were loaded with gasoline and the people thereon were calling for rescue, the service rendered by a tug was of a salvage nature, though the tug which rendered it was in no appreciable danger and a moderate reward should be made.

4. INDEMNITY ⬤⇒6—NEGLIGENCE OF CONTRACTOR'S SERVANT—PRIMARY LIABILITY OF OWNER—CONSTRUCTION OF CONTRACT.

Under a contract for the construction of a pier for an oil company on a cost basis, expenses of accidents being considered a part of the cost, *held*, that the company was primarily liable to the contractor for damage to vessels by a fire caused by the negligence of contractor's employé in throwing ashes into the oil-bearing waters of the harbor.

In Admiralty.   Consolidated suits by the United States against the Standard Oil Company of New Jersey and another, by the Maryland Transportation Company against the United States, and by the Maryland Transportation Company against the Standard Oil Company of New Jersey and another.   Decree for plaintiffs.

Samuel K. Dennis, U. S. Atty., of Baltimore, Md.

Harry N. Abercromie and J. Craig McLanahan, both of Baltimore, Md., for Maryland Transp. Co.

Kirlin, Woolsey & Hickox and Cletus Keating, all of New York City, and Ritchie, Janney & Stuart, of Baltimore, Md., for Standard Oil Co.

Marbury, Gosnell & Williams, William L. Marbury, and L. Vernon Miller, all of Baltimore, Md., for Raymond Concrete Pile Co.

ROSE, District Judge.   These cases, which have been consolidated, are the second group growing out of the fire at the Standard Oil pier in this harbor on the 22d of November last.   The opinion dealing with the first appears in The F. Q. Barstow (D. C.) 257 Fed. 793.

We are here concerned with the destruction of two barges belonging to the Maryland Transportation Company, hereinafter called

"Transportation," and their cargoes of gasoline and canned goods, respectively, the property of the United States, referred to herein as the "government"; with the claim of the Transportation against the government for salvage services to other scows and the goods on them, and with the contention of the Transportation and the government that the fire was caused by the negligence of the Standard Oil Company of New Jersey, for brevity styled the "Standard" and of the Raymond Concrete Pile Company, spoken of herein as the "Raymond."

Under contract with the Standard, the Raymond had for several weeks before the fire been engaged in the construction of a concrete pier, partly to replace the wooden pier, burned on the day in question, but in larger part to occupy the space immediately adjacent on the north. The Raymond was doing the work on the cost plus basis. It selected the workmen, but the Standard reserved the right to require the discharge of any person employed on the job, a privilege which it does not appear ever to have exercised. It was at liberty at any time, and on short notice, to end the contract. In building the pier, the Raymond used steam pile drivers, which of course produced ashes and clinkers.

Oil frequently floated over the suface of the dock in which they worked. Indeed, at times there was so much oil there and thereabouts that the Standard had men skim it off and bring it to shore, where it was again given commercial value. The quantity of oil in the dock at any particular time depended to a considerable extent upon the direction of the wind, and to a less degree upon the state of the tide. In consequence, the Standard told the Raymond more than once to see to it that all ashes thrown overboard from the pile drivers should be thoroughly wetted down before being cast into the water. The Raymond gave like instructions to those of its employés actually in charge of the work.

It is true that municipal ordinance and federal law prohibit the throwing of ashes into the harbor at all. Doubtless the parties assumed that they were not offending against the spirit of these enactments, as it was the purpose of the Standard thoroughly to dredge the dock so soon as the new pier was finished. Nevertheless the law was broken.

Apart from any legislative expression on the subject, every one knew how dangerous it was to throw live coals upon oil, even when the latter floated upon water. It is true that usually cinders pass through the oil so rapidly that nothing happens; but in this dock, when the wind is blowing from certain directions, chips and other small pieces of wood and similar floating material are likely to gather, and a coal may chance, as on this occasion it apparently did, to light on one of these and to remain on it long enough to set it afire, and then the harm is done.

On the day in question, and before the fire broke out, sight and smell bore witness to the presence of more than the usual amount of oil in the dock. It was noticed, among others, by one of the foremen of the Raymond, and he gave a renewed caution to the fireman on one

of its pile drivers to see that all ashes were wetted before they were thrown overboard. About 3 o'clock in the afternoon, the same fireman cast one or more shovelsful of ashes into the water. Very shortly thereafter a small fire was noticed on its surface. The testimony seems to show that there was an appreciable interval between the throwing over of these ashes and the beginning of the fire. It was doubtless brief—much less than the 5 or 10 minutes which some of the witnesses estimated for it—but still there was an interval; that is to say, there was no sudden flaring up of the oil and no instant explosion of either oil or gas.

When the fire was first seen, it covered a very few inches of the surface of the water. The fireman tried to smother it with two or three shovelsful of ashes, but they seemed rather to spread than to extinguish it. He then turned his hose on it, but that had apparently the same unfortunate effect. Then almost instantly the flames spread across the surface of the water to the covered pier and thence to the Barstow.

The witnesses who described its appearance at this time say that it swept over the face of the water in waves of flame. Some of the experts testify that this peculiar appearance may have been due to the diffusion of a considerable portion of gasoline or naptha vapor through the strata of air immediately above the water. Others equally learned in the chemistry of combustion say that any fire, fed by oil floating on water, may have a like seeming to the eye. Whichever is right, I think there can be no question that the proximate cause of the fire was the ashes thrown from the pile driver by the fireman, an employé of the Raymond. It is quite evident that everybody that saw the fire in its early stage was then of that opinion.

[1] One who throws ashes on the surface of water, visibly covered by oil, is, independent of statute, bound at his peril to make sure that there is no fire left in them. This the fireman failed to do, and for his neglect, his employer must answer to the appellants.

[2] By the Standard's invitation, vessels belonging to other people were in the dock at this and other times. It could not escape liability for any dangerous work which it sanctioned therein. It was, and for weeks had been, aware that ashes from the pile drivers were thrown into the dock. It knew better than most how perilous this practice was. It was having the work done on the costs plus basis. It was therefore directly concerned in keeping down the expense, and had an interest in using this cheap method to get rid of ashes and cinders. It was liable for the consequence of what was done, even though the actual doing was committed to an independent contractor. It, as well as the Raymond, is liable to the government and the Transportation for the damage the fire did them.

What did that damage amount to? In calculating it, it will be convenient first to determine to what salvage the Transportation is entitled. It claims that it saved two scows and their cargoes of gasoline drums, the latter of which belonged to the government, as did also one of the scows. The other was the property of the Transportation itself, but was chartered to the government. The Transpor-

tation says that this scow was in the military service of the government, and that, if it had been destroyed therein, the government, under the law, would have been bound to pay for it. Since Act Aug. 1, 1912, c. 268, 37 Stat. 242 (Comp. St. §§ 7990–7994) its common ownership of the salving tug and of the salved scow does not prevent its collecting remuneration for the service done. It therefore argues that it is entitled to be compensated by the government for saving its own scow.

It is unnecessary to consider this interesting question, as in the view I have taken of the character of services rendered, and the compensation which should be made for them, the allowance will not be materially affected whether the value of the scow be included or excluded from the total of the property rescued.

[3] The two scows saved lay at the outer end of the north side of the pier, which itself was to the north of that which was burned. The pier at which they were lying itself never took fire. Several vessels on the south side of it, and therefore nearer the fire, remained alongside of it throughout the conflagration, without suffering appreciable damage. On the other hand, the scows to which the service was rendered were loaded with gasoline drums. Men employed on them and other persons on the pier collected at its outer end, fearing to attempt to escape over the pier to land, as smoke and flames then appeared to them to be shooting over the shoreward end of it. They were calling for rescue. The tug, which did the service for which reward is now claimed, was in no appreciable danger, although some of those on it may at the time have thought otherwise. Its master, however, was not among them. He impressed me as being a singularly candid man. He said that he did not think that he did a risky thing. The time consumed was of the briefest. Still the service was of a salvage nature. It was something which ought to have been done, and for which proper, although moderate, reward should be made. An award of $1,000, two-thirds to the owners, one-third to the master and crew, will be a proper allowance. Of the third awarded to the crew, $50 will go to the master, and the rest should be apportioned among the master and crew, in proportion to their wage bill.

The value of the government property destroyed was $12,856.60, to which should be added the $1,000 above allowed for saving the other government property.

The Transportation lost two scows. They were alike, except that one was 9 years old, and the other 10. The evidence shows that a new scow, similar to those burned, would have been worth, at the time of the fire, $7,250. If the usual allowance of 5 per cent. each year off the value at the beginning of that year for depreciation be made, it will make the value of the nine year old scow, on the day it was destroyed, $4,568.95, and of the ten year old scow, $4,340.06, or a total of $8,909.01. For their hulls, $400 has been offered. The net loss to the Transportation was therefore $8,509.01.

For compensation, therefore, the Transportation is entitled to look to the Raymond and to the Standard, as is the government for the value of its property destroyed, plus the $1,000 salvage it is required

to pay, or $22,365.61 in all. Interest on the salvage award should run from the date of the decree, and on the other sums from the day of the fire.

[4] The question most strenuously contested, and upon which a rehearing has been had, is as to what are the rights, as between themselves, of the Raymond and the Standard? Is either primarily responsible and liable to the other, and, if so, which? The Raymond claims that the fire, or its disastrous consequences, were the result of the negligence of the Standard in permitting naptha distillate from the Barstow to escape into the harbor. The testimony leaves it at least doubtful whether there was any such escape, and, if there was, it altogether fails to show that it was attributable to any lack of care on the Standard's part.

Ordinarily this conclusion would close the controversy. Not so here, for the Raymond asserts that before the work began the Standard agreed to answer for any damage to person or property which might occur in the course of its doing. This contention is based upon the construction put by the Raymond upon an express term of the contract between it and the Standard; that construction being, as it says, the only one possible, in view of the general scheme and purpose of the bargain.

An analysis of the agreement shows that the Standard hired the experience, skill, and general executive organization of the Raymond, to organize, direct, and oversee, subject to the instructions of the Standard, the doing of the work for which the Standard was to pay. The Raymond was to receive 12½ per cent. on the cost of the work, with a provision that its fee should not exceed $20,000. In return, the Raymond was to furnish, at its New York office, the services of its executive officers. For practically everything else the Standard was to pay. Some specified heavy tools and machines were to be hired from the Raymond at a per diem rental. The other costs to be borne by the Standard were enumerated in great detail. In short, as the contract itself declares, the Raymond was employed to do the work as the agent of the Standard, and at the latter's charge. The cost of insurance and other expenses incurred in connection with any accident or damage to person or property was expressly mentioned among the things for which the Standard was to pay, and the same point was further emphasized by the declaration of the Raymond, in its letter confirming the acceptance of the contract:

"That any expense incurred in connection with any accident or damage done upon person or property, not covered by insurance, shall be considered a part of the cost of the work, but no fee shall be paid to the contractor on this cost."

It is easy to conceive of accidents which are not the result of the negligence of any one, but after all they are few as compared with the number of those which happen because some one has done that which he ought not to have done, or has left undone that which he ought to have done.

The parties to this contract were aware that it was highly probable that in the doing of the work there would be accidents, damaging life,

limb, or estate. They knew that most of them would be the result of carelessess of some one employed by the Raymond. There could have been no question that, if the work was to be done at reasonable cost, the Raymond would have to use every day people of about the average of care and skill, and that some of them, at some time or other, would be careless, and once in a while would hurt somebody or something. The damage thus done, no matter who paid for it, would be as much a part of the cost of the work as were the sums paid for labor, fuel, or tools. The undertaking by the Standard to assume liability for such damage was of a piece with the whole scheme of the bargain it was making. It was alive to the possible danger it was running, and for its at least partial protection reserved the right to demand the discharge from the work, of any particular employé of the Raymond, although generally speaking, the right of hiring and firing, to use the modern vernacular, was left to the latter. Moreover, on 10 days' notice the Standard might stop the work altogether.

It is asked: Will the law permit any one to contract himself out of the consequences of his own negligence? That he may not is a salutary doctrine, and one not lightly to be tampered with. Very likely it is true that one may not bargain in advance that he may be as careless as he pleases, and not be answerable for the harm he does. He must always use ordinary care. If he is employed because he holds himself out as having special skill, it may be that no language which falls short of a clear disclaimer that he has it will excuse his failure to exercise it.

A corporation cannot act, except through some human agent, and it may be it will not be permitted to stipulate that such of those agents as actually direct and manage its operations may be careless in so doing, without making it liable. If individuals or corporations are carrying on some public service business, or are otherwise so situated that others are not in a position to deal with them on an equal footing, public policy may well forbid their exempting themselves from the consequences of the carelessness of those whom they may employ.

But, assuming all this to be true, does it follow that there is any reason why it should not be held that the Standard is bound by the agreement it made? What did it ask from the Raymond, and what did the Raymond undertake to give? Obviously, careful and skillful use by its executive officers of its special knowledge, organization, and experience in the doing of this kind of work, and that was all. It, of course, was bound to exercise due care in selecting the numerous workmen whom it was to choose and hire, and whom the Standard was to pay, but it is not easy to see anything in the kind of agreement made, or in the relation of the parties to each other, which gives the public any interest in asserting that one, rather than the other, shall insure the persistent carefulness of the men so chosen.

There was no attempt to show any lack of care in the employment of the fireman whose negligence caused the disaster. It was true that the Standard had the right to give such instructions as it saw fit for the management of the work. It may well be, if any such instructions had been given, and the executive officers of the Raymond had failed

to do their best to carry them out, the Raymond would have been liable for the consequences, in spite of the Standard's undertaking to pay for accidents.

It is established that the Standard told the Raymond that the ashes should be thoroughly wetted down. The officials of the Raymond, and its foreman on the job, repeated and emphasized this order. There is no reason to suppose the fireman who started the fire did not suppose the shovelful which did the harm had been sufficiently drenched with water. He simply assumed the wetting had been thorough, without making sure that it was. That is precisely the kind of human shortcoming of which most individuals are likely to be guilty sometime or other, when ordinary men are employed at ordinary wages. The Raymond permitted the dangerous practice of throwing ashes into the oil bearing waters. The Standard knew and apparently approved. There was no willful disobedience by anybody of the Standard's order's. In carrying them out, there was no lack of care on the part of the executive officers, or even of the foreman of the Raymond. There was carelessness on the part of the fireman, who did not thoroughly extinguish every spark in the ashes, but, if what already has been said is sound, the Standard had assumed liability for the consequences of such kinds of negligence on the part of the ordinary employés on the work. There was a chance that throwing ashes into the harbor would do a great deal of harm. It was, perhaps, a small chance. The cost of otherwise disposing of them might have been appreciable. It was a risk which both parties took in order to keep down trouble and expense, a saving which inured almost entirely to the benefit of the Standard.

From what has been said, it follows that the decree should be so drawn as to make the Standard, as between itself and the Raymond, primarily liable.