## TEXAS GULF SULPHUR CO. et al. v. PORTLAND GAS LIGHT CO.

### No. 2640.

Circuit Court of Appeals, First Circuit.

April 7, 1932.

BINGHAM, Circuit Judge, dissenting.

Forrest E. Single, of New York City (Single & Hill, Frank H. Gerrodette, and Edward J. Keane, all of New York City, and Frederick R. Dyer, of Portland, Me., on the brief), for appellants.

Carl C. Jones, of Portland, Me. (William S. Linnell, Porter Thompson, and Bradley, Linnell, Jones, Nulty & Brown, all of Portland, Me., on the brief), for appellee.

Before BINGHAM and WILSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge.

These cases, consolidated for appeal, come before this court on exception by the plaintiffs to the granting of a nonsuit by the United States District Court for the District of Maine. Each plaintiff, by its declaration, alleges that the defendant corporation, in the process of manufacturing, selling, and distributing illuminating gas at its plant on West Commercial street, Portland, Me., had large quantities of oils, gas waste, sludge, and other materials, liquids, and substances of a highly dangerous and inflammable nature. That on the sixteenth day of September, 1929, the plaintiffs were the owners of certain quantities of sulphur stored upon the Portland Terminal Company wharf No. 1, at Portland, near by the premises of the defendant, and that the sulphur was of great value; that on the sixteenth day of September, 1929, the defendant negligently and carelessly and in violation of a certain municipal ordinance of Portland, passed on April 22, 1922, forbidding the deposit of oils, waste, or other inflammable and dangerous substances in the waters of Portland harbor, caused or permitted large quantities of oil, waste, gas, sludge, coal tar, and other materials, liquids, and substances of a highly inflammable and dangerous nature to float from the surface of its premises on West Commercial street, Portland, or through certain channels, drains, or sewers on its premises, upon and into the waters of Portland harbor, from whence it floated over and upon the surface of the waters of the harbor, and under the wharf No. 1 of the Portland Terminal Company upon which the plaintiffs' sulphur was stored; and also around the pilings supporting the wharf, and to accumulate under the wharf. That those oils, gas waste, sludge, coal tar, and other materials so discharged from the defendant's plant and so accumulated under the Portland Terminal Company's wharf No. 1 became ignited on September 16, 1929, and a serious fire arose therefrom, and that the plaintiffs' sulphur, so stored on the Portland Terminal Company wharf No. 1, was burned and was then and there totally destroyed; and that the fire and the destruction of the sulphur by the fire was not caused by the negligence

802

or fault of the plaintiffs, but was wholly due to the negligence, carelessness, and unlawful conduct of the defendant, its agents, and servants, in causing or permitting its oils, gas waste, sludge, and other materials of a dangerous and inflammable character to be discharged from its premises into Portland harbor.

In the second count the plaintiffs allege that the allowing of the oil, sludge, and so forth to discharge and float into and upon the harbor constituted a public and private nuisance. Each plaintiff, then, bases its case upon the negligence, carelessness, and unlawful conduct of the defendant.

The testimony and photographs before the court show the location of the wharves. Each plaintiff is lessee of the Portland Terminal Company wharf No. 1, and its sulphur sheds are located on it. In the leases from the Portland Terminal Company to the plaintiffs, the lessee "covenants and agrees to take upon itself all risk of loss by fire to the contents of said building and neither it nor any person claiming under it shall have or make any claim upon the lessor for any damage to said contents from fire caused by sparks or coals from any locomotives or otherwise."

This wharf is located on the harbor side of the Portland bridge. To the west of it and above the bridge, towards Fore river, is the wharf No. 2, and to the west of that is the defendant's property. Wharf No. 1, namely the Portland Terminal Company wharf, is about 1,100 feet long; the fire started very near the middle of this wharf. From the westerly corner of wharf No. 1 to the first sewer coming out of the defendant's property is 680 feet; this makes the sewer approximately 1,200 feet from the middle of the wharf. There are three city sewers, one coming out under wharf No. 2, and one under wharf No. 1, and one coming out on the railroad property on the wharf adjoining to the east. These city sewers are the outlet for sewers covering a large area, covering surface grades, garages, and places where oil is used for heating, both domestic and commercial. To the west of the defendant's property, towards Fore river, are large storage tanks of petroleum products, belonging to the Standard Oil, Shell, Cities Service, Gulf, Mexican Petroleum, Rolling Mills, Ricker's, International Paper Company, Texas Company, and part way across the harbor, almost opposite wharf No. 1, the storage tanks of the Cumberland County Power & Light Company are situated. The testimony shows that gasoline and oils are un-

loaded from steamers into these tanks. Deake's wharf adjoins wharf No. 1 on the east; on this wharf is the Brawn sardine factory. The Brawns, at this factory, use cottonseed oil and burn a crude oil for fuel; they have a crude oil and a gasoline boat. Crude oil is thick and black. There are many filling stations, garages and machine shops on the waterfront. There is testimony that some kind of oil is seen on the harbor "practically every day of the year." The fire occurred, between five and half-past five in the afternoon (daylight saving time). Witnesses saw ashes containing live coals or hot burning clinkers coming down the chutes of the Portland Terminal Company wharf. A witness was called who saw coal burning right under where the coals are dumped. One witness says: "I should judge it was under the chute where they had been dumping the ashes." "There was a tower right over the fire when it first started." A witness saw a gush of flames coming from underneath the wharf that went up and struck the side of the steamer Plymouth. A witness testified that he could see nothing underneath the wharf where the fire started but coal and ashes. On the day of the fire oil was seen upon the harbor, and it was in testimony that this oil flowed with the tide down the river, under the Portland Terminal Company's wharf and around the wharf supports. It was seen clinging from the Portland Terminal Company's wharf and about the piles of the wharf. It was inflammable, and when touched by a live ember burst into flames. The steamer Bandi at Deake's wharf caught fire during the progress of the fire. Holland, the steward of the steamer Plymouth, testified that at the time of the fire he was standing amidships on the steamer; that he went down to the lower deck and looked out and could see under the wharf, and that he saw an oil residuum under the wharf. He said he had seen a heavy oil substance more or less all the afternoon, and the only place he saw it on the water was on the starboard side of the Plymouth, the side farthest from the wharf; that he got no odor. He saw oil on the spiles.

Boyce, chairman of the house committee of the yacht club, testified that he was called by the steward of the club between eight and nine o'clock in the morning to look at the conditions of oil about the wharf of the club, the club being about one-tenth of a mile east of the wharf No. 1. He found a heavy film of oil on the water, quite thick, of a light color, like amber, floating over the dock. It

was sticky, like all oil. Boyce had a machine shop on Central Wharf for seven years, and has seen oil of some kind on the water of the harbor nearly every day, though differing in appearance and thickness from that seen around the No. 1 wharf of the Portland Terminal Company on September 16, 1929. At the outburst of the fire he was on his way to the yacht club in his automobile and, on reaching the scene of the fire, saw the burning embers fall in front of the Bandi; there was an immediate flash and a flame that shot up to the bowsprit of the boat. It smelled like lubricating oil or gasoline. He testified that the oil he saw on the morning of the fire, at the yacht club, smelled more like fuel oil.

The plaintiffs place great stress upon the testimony of Thorndike, a collector of waste from sardine factories. He testified that he ran his boat up just above the bridge and looked up towards the defendant company's wharf; that at Deake's wharf and around the Plymouth, under the Portland Pier opposite the Portland Terminal Company wharf No. 2 and opposite the gas works, and as far as the dolphins, he saw something that had the appearance, smell, and color of gas waste; that he saw a tarry substance coming down between the bow of the Plymouth and wharf; that he noticed that the tarry substance was along the docks and at the stern of the Plymouth, and he followed that along up as far as No. 2 to the dolphins off the gas company, and that he did not see any of the tarry substance above these dolphins.

The president of the gas company was called by the plaintiffs and testified that the company manufactures nothing but illuminating gas, except by-products; that those by-products are coke and a residue that comes from the manufacture of gas that is called tar. It was in evidence that tar does not float on the water. The plaintiffs filed a memorandum furnished by the defendant covering the year 1929, and showing for each month the amounts of coal used, gas manufactured, and the amount of the by-products of tar and coke. It is of little, if any, value in determining whether there was any escape of tarry waste, since it does not show the respective proportion of coal gas and water gas which was being manufactured during any period; and the testimony shows that there is comparatively little tar residuum from so-called water gas.

The record contains much testimony similar in character to that to which reference has been made. It is impossible, of course, to recite all this testimony. But even if we assume that plaintiffs' evidence, taken in the most favorable light for the plaintiffs, might warrant the jury in finding that the oily substance found upon the harbor and under the wharf where the fire started proceeded from the defendant's plant, and not from other sources in the harbor, and by reason of some negligent act or omission on the part of the defendant, and within the defendant's knowledge and control—the testimony of the president of the defendant company, however, tends to negative such knowledge—still the burden is the plaintiffs' to prove, even if the defendant were guilty of negligence, that it was the proximate cause of the fire. Examination of the record, however, leads us to the conclusion that there is no substantial evidence from which the jury could find that the oil on the water was the proximate cause of the fire, even if the oil came from the defendant's plant.

It is clear, we think, that the fire was caused by the dumping of ashes containing live coals and red hot clinkers by the employees of the Portland Terminal Company at their wharf, upon the flats beneath the wharf; but there is not even a scintilla of evidence that the defendant knew that any oil or other inflammable material, whether escaping from its plant or not, would accumulate under the No. 1 wharf of the Portland Terminal Company, or of the custom of the terminal company in dumping the contents of the fire box or ash box of its stationary engines into the harbor at the close of each day.

The ordinance of the city of Portland of August 10, 1923, provides that it shall be unlawful to discharge oil, sludge, etc., into the waters within the limits of the city of Portland, from any wharf, etc., and it provides a punishment for the offense. Chapter 301 of the Private and Special Laws of Maine 1909, specifically prohibits the throwing of any ashes into the waters of Portland harbor and provides a punishment. This statute is found in the Special Laws of Maine, but it is of a public and general character. It applies to all persons. There is no restriction of locality which prevents it from being public and "obligatory on all citizens." Wigmore on Evidence (2d Ed.) Vol. 5, § 2572; Burnham v. Webster, 5 Mass. 266, 269.

Assuming that the inflammable substance floating on the waters of the harbor and deposited on the flats beneath the No. 1 wharf of the Portland Terminal Company on September 16, 1929, or some part of it, came from the defendant's plant, there is not

even a scintilla of evidence, or any evidence from which it could reasonably be inferred that such material was intentionally discharged into the waters of the harbor by the defendant.

On the contrary, there being no evidence as to how it did escape, if it did, from the defendant's plant, the presumption is that the defendant obeyed the ordinance of the city of Portland and the state and federal law, and did not intentionally discharge, or knowingly permit, any waste prohibited by law to be discharged from its plant into the harbor.

Surely it is not a reasonable conclusion that the defendant would deliberately discharge, or knowingly permit to escape, any of its tar by-products for which it had a ready and profitable sale under a contract.

■ The only conclusion a jury could properly reach from this record, if it found that a tarry by-product of any kind did escape from the defendant's plant during September 16, 1929, is that it was due to some act of omission on the part of the defendant, since there is no positive evidence as to how it occurred. The plaintiffs, therefore, must show, to establish the negligence of the defendant as the proximate cause of the fire, that a reasonable man would have anticipated that the result which followed was a probable result of its negligent omission, viz., that not only that inflammable substance would escape from the plant and find its way into the harbor, but that it would eventually be deposited at low tide under No. 1 wharf of the Portland Terminal Company, and also that the Portland Terminal Company would deliberately, in defiance of city and state law, deposit ashes containing live coals on the flats beneath its wharf.

In view of the fact, as the plaintiffs' evidence shows, that some kind of oil is frequently seen upon the waters of Portland harbor, and in view of the statute affirmatively forbidding the dumping of ashes into Portland harbor, we think a jury would not be permitted to find that in the natural course of events it would reasonably be expected that ashes containing live coals and hot clinkers would be thrown into the harbor or on the flats underneath the wharf of the Portland Terminal Company.

In United States v. Standard Oil Co. of New Jersey, 258 F. 697, 698, 699, the District Court of Maryland held that where a fireman on a pile driver, used by his employer in the construction of a pier in the harbor, threw ashes into waters visibly covered by oil, causing a fire which destroyed barges and their cargoes, the company for which the pier was constructed on a cost basis and which was aware that ashes were thrown overboard was liable for the consequences, though the employer doing the work was an independent contractor. The court found that the throwing of the ashes into the harbor violated both the municipal ordinance and the federal law. Judge Rose said:

"It is true that municipal ordinance and federal law prohibit the throwing of ashes into the harbor at all. Doubtless the parties assumed that they were not offending against the spirit of these enactments, as it was the purpose of the Standard thoroughly to dredge the dock so soon as the new pier was finished. Nevertheless the law was broken.

"Apart from any legislative expression on the subject, every one knew how dangerous it was to throw live coals upon oil, even when the latter floated upon water. * * *

"One who throws ashes on the surface of water, visibly covered by oil, is, independent of statute, bound at his peril to make sure that there is no fire left in them. This the fireman failed to do, and for his neglect, his employer must answer to the appellants."

■ In Horan v. Watertown, 217 Mass. 185, 187, 104 N. E. 464, 465, in speaking for the Massachusetts court, Mr. Justice Sheldon said: "The rule applicable to such cases is well settled by our decisions. Where as here the original negligence of the defendant is followed by the independent act of third persons which directly results in injurious consequences to the plaintiff, the defendant's earlier negligence may be found to be the direct and proximate cause of those injurious consequences, if according to human experience and in the natural and ordinary course of events the defendant ought to have seen that the intervening act was likely to happen. But if this is not the case, if the intervening act which was the immediate cause of the injury complained of was one which it was not incumbent upon the defendant to have anticipated as reasonably likely to happen, even though a high degree of caution would have shown him that it was possible, then he owed no duty to the plaintiff to anticipate such further acts, the chain of causation is broken and the original negligence cannot be said to have been the proximate cause of the final injury. Lane v. Atlantic Works, 111 Mass. 136; Stone v. Boston & Albany Railroad, 171 Mass. 536, 51 N. E. 1, 41 L. R. A. 794; Glassey v. Worcester Consolidated Street Railway, 185 Mass. 315, 70

N. E. 199; Jacobs v. New York, New Haven & Hartford Railroad, 212 Mass. 96, 98 N. E. 688, 40 L. R. A. (N. S.) 41. In these cases the earlier decisions are so fully cited that we need not refer to them."

While in Lane v. Atlantic Works, 111 Mass. 136, the Massachusetts court held that the jury might properly find the defendant guilty of negligence in doing that from which injury might reasonably have been expected and from which injury resulted; and see, also, Ela v. Cable Co., 71 N. H. 1, 51 A. 281, and The Santa Rita (C. C. A.) 176 F. 890, 30 L. R. A. (N. S.) 1210. In Stone v Boston & Albany Railroad, 171 Mass. 536, 51 N. E. 1, 41 L. R. A. 794, and in the other cases cited by Judge Sheldon, the correct rule is laid down which governs the case at bar.

In The Lusitania, 251 F. 715, 732, the District Court for the Second Circuit held:

"There is another rule, settled by ample authority, viz. that, even if negligence is shown, it cannot be the proximate cause of the loss or damage, if an independent illegal act of a third party intervenes to cause the loss. Jarnagin v. Travelers' Protective Ass'n, 133 F. 892, 66 C. C. A. 22, 68 L. R. A. 499; Cole v. German Savings & Loan Soc., 124 F. 113, 59 C. C. A. 593, 63 L. R. A. 416. See, also, Insurance Co. v. Tweed, 7 Wall. 44, 19 L. Ed. 65; Railroad Company v. Reeves, 10 Wall. 176, 19 L. Ed. 909; Insurance Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395; The Young America (C. C.) 31 F. 749. * * *

"The cause of the sinking of the Lusitania was the illegal act of the Imperial German government, acting through its instrument, the submarine commander, and violating a cherished and human rule observed, until this war, by even the bitterest antagonists."

In Cole v. German Savings & Loan Society, 124 F. 113, 119, 63 L. R. A. 416, the defendant was negligent in maintaining an improperly lighted hall so that it was difficult to see the elevator at a lower floor. A third party, thought by plaintiff to be the elevator boy, and who was not an agent of the defendant, opened the sliding door of the elevator well while the elevator was at another floor. Plaintiff stepped in, supposing the elevator was there, and fell to the bottom of the well. The judgment was for the defendant. Speaking for the United States Circuit Court of Appeals in the Eighth Circuit, Judge Sanborn said: "The act of the strange boy was a violation of the law. It was a trespass upon the property and upon the rights of the defendant. The defendant

could not foresee or reasonably anticipate, and it was not required to anticipate or to provide for, violations of the law and trespasses upon its property by its fellow citizens. The legal presumption was that this boy and all boys and men would obey the law, would refrain from committing trespasses upon the defendant's rights of property, and would discharge their moral and social duties."

In Jennings v. Davis, 187 F. 703, 713, the action was by the owner of property against a pipe-line company. The defendant's pipe-line burst; plaintiff notified it that oil was around the buildings of the plaintiff. Cross, a blacksmith, occupying one of the plaintiff's buildings, lighted a fire in his forge with knowledge of the presence of oil; a fire ensued which destroyed the plaintiff's buildings. The judgment was for the defendant. The United States Circuit Court for the Fourth Circuit said: "In the view which we take of the uncontroverted testimony, the conduct of Cross was negligent. While it is true that ordinarily the question of proximate cause is for the jury, it is equally true that, where the evidence is uncontroverted and but one inference should be drawn, the question is one of law for the court. The record brings the case within this principle. Cole v. German Sav. & Loan Soc., 124 F. 113, 59 C. C. A. 593, 63 L. R. A. 416."

So, too, in Davis v. Schroeder (C. C. A.) 291 F. 47, 52, the court said: "It is insisted that the question of proximate cause was for the jury. Ordinarily this is true, but where there is no substantial evidence upon which a jury can properly render a verdict in favor of the party producing it, the court should instruct a verdict."

Again, in Glassey v. Worcester Consolidated Street Railway Co., 185 Mass. 315, 316, 70 N. E. 199, 200: "The material facts, with the inferences to be drawn from them, are not in dispute, and in such a case the question of remote or proximate cause is one of law for the court. Stone v. Boston & Albany Railroad, 171 Mass. 536, 543, 51 N. E. 1, 41 L. R. A. 794; McDonald v. Snelling, 14 Allen, 290, 299, 92 Am. Dec. 768; Hobbs v. London & Southwestern Railway, L. R. (1875) 10 Q. B. 111–122."

In the instant case, the act of the employees of the Portland Terminal Company in throwing ashes containing live coals and hot clinkers on the flats underneath the wharf in Portland harbor was the cause of the fire. This act was in violation of a statute affirmatively forbidding the dumping of

ashes into Portland harbor. Independent of any ordinance or statute, we think a jury would not be permitted to find that it could reasonably be expected that ashes containing live coals and hot clinkers would be thrown into Portland harbor where oil of some kind is frequently floating on the water.

Upon a careful study of the record, we are of the opinion that, inasmuch as there was no substantial evidence that any negligence which could be imputed to the defendant was the proximate cause of the fire, the District Court properly ordered a nonsuit.

The judgments of the District Court are affirmed, with costs for the appellee in this court.

BINGHAM, Circuit Judge (dissenting).

These actions were tried together in the federal District Court for Maine, the Texas Gulf Sulphur Company being the plaintiff in one and the Freeport Sulphur Company the plaintiff in the other. They are actions of tort to recover damages for the destruction of certain sulphur owned by the respective plaintiffs, claimed to have been destroyed by fire through the negligence of the defendant, the Portland Gas Light Company. At the close of the plaintiffs' evidence the court directed verdicts for the defendant, judgments were entered thereon, and appeals taken.

In the respective declarations it was alleged that, on the 16th of September, 1929, each of the plaintiffs owned certain surphur then stored in bins in a shed located on wharf No. 1 of the Portland Terminal Company in Portland, Me., which on that day was destroyed by fire caused by the ignition of certain highly inflammable gas residue or gas waste which the defendant negligently and in violation of law allowed to escape from its premises, adjoining those of the Portland Terminal Company, out upon the tide waters of Fore river in Portland harbor and be carried thereby to and under said wharf No. 1, where it took fire and destroyed the wharf and sulphur.

The particular ground upon which the trial court directed verdicts for the defendant was that there was no substantial evidence from which the jury would be warranted in finding that the gas residuum or oily substance, which the plaintiffs alleged was the cause of the fire, came from defendant's premises.

The plaintiffs' evidence tended to show that, on the 16th of September, 1929, each of the plaintiffs had a large quantity of sulphur stored in bins in a shed on wharf No. 1 of the Portland Terminal Company; that wharf No. 1 was a long wooden pier erected on piles fronting along Fore river in Portland harbor; that the premises of the terminal company were on the northerly bank of the river, and that adjoining them on the west was the gas plant of the Portland Gas Light Company; that the flow or course of the river at this point was towards the east into Portland harbor, but in front of these properties was subject to the ebb and flow of the tide; that, at the easterly end of the property of the Portland Terminal Company, that company had a wharf constituting the westerly side of a dock; that on the easterly side of this dock was a wharf known as Deake's wharf, occupied by the Brawns, who were engaged in the sardine packing business; that wharf No. 1 of the terminal company extended from its easterly terminus at the dock westerly about 1,100 feet, and its wharf No. 2 from the latter point nearly to the gas company's premises, 440 feet; that, at the time of the fire, at the extreme westerly end of the terminal company's premises was a bridge abutting thereon and extending over Fore river, known as the Portland bridge; that on wharf No. 1 and 37 feet from where it faced on the water was a sulphur shed, the easterly end of which was 100 feet west from the easterly line of the terminal company's premises; that the sulphur shed was 36 feet wide and extended westerly 440 feet or to about the middle of wharf No. 1; that along the front or water side of wharf No. 1 were what is known as two gantry rails extending westerly a short distance beyond the west end of the sulphur shed, and easterly a short distance beyond the easterly end of the sulphur shed, the southerly rail being near to and along the front of the wharf and the other being some distance north of it, but in front of the sulphur shed; that in the space intervening between these gantry rails were two railroad tracks on which coal cars were shifted forward and back in the unloading and loading of coal from steamers to cars; that raised above and over these two railroad tracks were hoisting towers, four in number, which could be moved easterly or westerly on the two gantry rails as occasion required in the use of the towers or cranes thereon in unloading and loading coal as above stated; that north of the northerly gantry rail and under the raised sulphur shed were two railroad tracks, where cars passing beneath the shed were loaded by discharging the sulphur

from the shed's bins to the cars beneath; that north of and outside the sulphur shed was another railroad track running easterly and westerly the length of pier No. 1; that the four towers had raised platforms on each of which was located an engine and machinery used in operating the cranes for unloading the coal or sulphur, as the case might be. Captain York, who was born in Portland and lived there all his life, testified that he was a master mariner of 35 years' experience and had sailed in and out of Portland harbor during that time bringing coal to Portland in six-masted schooners as well as steam vessels and discharging it at wharf No. 1. A picture produced in evidence disclosed a six-masted schooner moored in front of wharf No. 1, which the captain identified as one of the vessels which he commanded in those early days. This picture also disclosed that when the schooner was discharging coal in those early days wharf No. 1 was equipped with four hoisting towers, at the rear or north of which was the sulphur shed, and on the wharf were the tracks over which cars and engines moved, the same as at the time of the fire, clearly indicating that the business on that wharf had been conducted through all those years in the same manner as it was at the date of the fire.

There was also evidence that the piles under wharf No. 1 and extending lengthwise of the wharf were, from center to center, 5½ feet apart and, from the front of the wharf to the rear, the piles were located, from center to center, about 5 feet apart; that on the top of the piles were cap rails and stringers, running east and west and north and south, on which the planking constituting the floor was laid; that mean low water was 15 feet below the top of the wharf, and mean high water 6½ feet below the top or 8½ feet above mean low water, and that the distance from the front of the wharf to where mean low water met the land under the wharf varied from 21 or 22 feet to 80 feet, the greater distance apparently being in the region toward the westerly end of the sulphur shed; that at high tide water flowed back under the wharf its width, and at low tide a part of the shore or land under the wharf was out of water, so that substances carried in at high tide would settle upon this land when the tide fell; that each of the towers where the stationary engines were located had a chute adjusted to discharge into openings (some six in number) in the wharf floor through which cinders and ashes could be let down

from the fire boxes of the engines upon the mud flats and water below the wharf; that the Portland bridge was open underneath and allowed free passage of the river at high and low tide; that the gas company made and stored on its premises gas which it sold for domestic and commercial purposes; that in the manufacture of this illuminating gas there resulted a waste of a black tarry sludge or gas residuum; that along the water front of its premises was a sea wall, and from this wall, at different points, four pipes varying in size from 6 to 10 inches in diameter, and which drained its premises, entered the bay or river; that one of the discharge pipes was located at or near the southeasterly corner of the gas company's premises, a short distance from which were two dolphins standing in the bay or river; that this black, oily sludge or gas residue, if discharged through these pipes into the river, would flow with the tide or current down the river and under the Portland Terminal Company's wharves and around the supports below them; that along after 1 o'clock on the day of the fire, black, oily sludge or gas works residue was seen around the dolphins at the southeasterly corner of the gas company's premises, but not above there, and was also seen at different points extending down by the Portland Terminal Company's wharf and down as far as the dock at Deake's wharf, and even below. The steward of the Plymouth, which had been tied up from the early morning of that day at wharf No. 1 discharging coal, testified that the men operating the towers and discharging coal quit work at 4 o'clock that afternoon; that when they quit work he saw ashes containing live coals discharged down through the chute from tower No. 2; that at that time he was on the main deck "standing about amidships, aft"; that after standing there a short time, the cook called to him that there was a fire under the wharf; that he then went below to the well deck, and, looking out through a hole in the side of the vessel, saw "black smoke" underneath the wharf and a "coalish fire" located some 15 to 20 feet away from the boat on the shore under the wharf; that as he "was looking underneath the wharf there was a part there that was bright that I could see, and it seemed to me as though there was an oily look down there"; that he saw that afternoon on the water, on the side of the boat away from the wharf, oil of some sort, and being asked if it "was the same sort of substance that you said you saw under the

wharf," answered, "a dark colored oil"; that after looking under the wharf, he went up on the main deck and had been there perhaps five minutes when a great volume of flame sprang up between the wharf and the side of the boat, setting the wooden superstructure of the Plymouth above the steel hull on fire, also the wooden structure of the hoisting towers above the wharf; that the fire was so intense that one could not go near the side of the boat next to the wharf; that the place under the wharf where he saw the coalish fire burning was under the chute through which he had seen the ashes dumped, and that, as he recalled it, that chute was connected with tower No. 2, counting from west to east.

It also appeared that on the day of the fire a four-masted schooner, the Elizabeth Bandi, was tied up at Deake's wharf with her bow pointed into the opening of the dock; that between 2 and 3 o'clock in the afternoon a thick, heavy, black mass of oily, tarry substance was seen coming down from under the wharf of the terminal company and going into the dock in front of the Bandi and that, after the fire broke out on No. 1 wharf, an ember fell into the oily mass on the water in the dock in front of the Bandi and instantly a fire, described as covering a space of 60 by 30 feet on the water, sprang into the air and set the bowsprit of the Bandi on fire; that it was high tide that day at 9:29 a. m. and low tide at 3.24 p. m.—that is, from 9.29 a. m. on it was ebb tide and the current was running from the gas works down by wharfs Nos. 1 and 2 of the Portland Terminal Company up to 3.24 p. m., and at the rate of about one mile an hour; that thereafter, for about three quarters of an hour or some longer and down to the time of the fire, it was flood tide, and the current was running westerly; that the wind was from the south against the north bank of the river, being about six miles an hour around 10 o'clock in the morning and increasing thereafter so that in the afternoon it was from ten to sixteen miles an hour; and that the fire broke out about 4.10 p. m. or a little later. (The above figures refer to standard time.)

From the foregoing evidence the jury would be warranted in finding that this dark, oily sludge, seen at the dolphins near the southeast corner of defendant's premises and not above there, on the early afternoon of the day of the fire, also seen that afternoon attached to the piles of the wharves of the Portland Terminal Company and on the land under its wharves, and seen coming on the water from under these wharves into the dock at Deake's wharf, came from the defendant's premises; that the defendant was negligent in discharging it into the waters of the harbor not only for the reason that in so doing it violated an ordinance of the city of Portland, but to discharge such highly inflammable matter where it would be carried down under its neighbor's wharves was, in itself, a careless act, especially in view of defendant's undoubted knowledge of the nature of the business being conducted there.

The defendant, however, contends, even though it were negligent in discharging this highly inflammable material into Fore river, and even though it reasonably could be found from the evidence that it knew it would be carried by the tide to the piles, land and water under its neighbor's wharf, that after it discharged the inflammable material into the river it was beyond its control, and its negligent act in discharging it where it would flow upon its neighbor's property and under its wharves created a mere condition and was not a contributory cause of the destruction of the plaintiffs' sulphur on the wharf.

But from the evidence the jury might reasonably find that the defendant knew or was bound to know that this highly inflammable material would be carried upon the piles, land, and water under its neighbor's wharf and that it was bound to take reasonable steps to inform its neighbor of the dangerous situation which it had created there; that it failed to do this and that its negligent conduct in this respect continued down to the very moment of the breaking out of the fire and was a contributing and proximate cause of the plaintiffs' losses, even though the conduct of its neighbor or its neighbor's servants also may have been negligent or wrongful and a contributing cause. Ela v. Cable Company, 71 N. H. 1, at page 3, 51 A. 281.

The defendant has overlooked this situation. Throughout its argument it has assumed that, after it had negligently discharged this inflammable material into Fore river, it ceased to have any further control or duty in respect to the matter; that, at the time it did the negligent act of discharging the inflammable material into Fore river, it could not reasonably anticipate that, after it came upon its neighbor's premises, it might become ignited either accidentally or carelessly through some act of its neighbor or neighbor's servants in the conduct of the business there carried on; and that there was

no substantial evidence from which the jury would be warranted in finding that it should have so anticipated.

But, even viewed from this standpoint, there was substantial evidence from which it could be found that the defendant should have anticipated that it was likely to become ignited in this manner. The evidence shows that the defendant and the Portland Terminal Company were adjoining property owners and undoubtedly had been so for a long period of time; that the distance from defendant's plant to the center of wharf No. 1 was only about 1,100 feet and in plain view; that the Portland Terminal Company for a long period had occupied this property on Fore river where wharf No. 1 was located discharging coal from vessels into coal cars; that the defendant gas company, in conducting its business where it did, in the immediate neighborhood of the terminal company's wharf, could not have failed to know the nature of the business carried on there; that it consequently knew that locomotive engines, when coal was being discharged on wharf No. 1, as it was on the day of the fire, were being operated up and down that wharf shifting cars and would be sending out sparks, which, if they came in contact with this highly inflammable material, would cause a fire and a conflagration; that it not only knew of the steam locomotives operating there but must have seen and known of the existence of the stationary engines located in the four discharging towers, which were constantly giving off smoke and cinders when discharging coal; that, if it did not actually know of the existence of the chutes, which were in plain view, on the towers and through which ashes from the stationary engines were discharged upon the mud flats and water under the wharf, it knew or could reasonably anticipate that such ashes must be removed from these tower engines, and if its neighbor's servants were negligent in their removal, and live coals should come in contact with the inflammable material, a fire would take place.

There is no evidence in the case from which it could be found that its neighbor, the Portland Terminal Company, or its servants, knew of the presence beneath the wharf of this highly inflammable material, and, knowing of its presence, intentionally discharged ashes containing live coals upon it; or, knowing of its presence, recklessly not caring, discharged ashes containing live coals upon it. If there had been evidence from which it could have been found that the terminal company or its servants knew of the presence of this inflammable material beneath the wharf and in discharging ashes containing live coals did so willfully, intending to set the material on fire, and such conduct, if found to exist, would, as a matter of law, break the causal connection and be the sole cause, the question would still involve material issues of fact for the jury to find before the rule of law would become applicable, necessitating the submission of the issues of fact to the jury under proper instructions as to the law, which was not done.

It is also contended by the defendant that the discharge of the ashes into the water or upon the mud flats under the wharf was a violation of a statute of the state and of the United States, and, being such, the defendant was not bound to anticipate such an act. But these statutes were not enacted for the purpose of preventing fires, as was the ordinance of the city of Portland forbidding the discharge of oil or other inflammable substances into the waters of Portland harbor; that ordinance was to protect the public doing business upon and along the waters of that harbor from a conflagration. The statute of Maine and the federal act were enacted to prevent the filling up of the channel so as to impede navigation. The mere discharging of ashes or other waste upon the mud flats or into the water would have caused no fire. And it is highly improbable that the discharge of ashes containing live coals upon the mud flats or into the water under the wharf would have caused a fire but for the defendant's negligence in causing the inflammable material to be there. It never had, although the men in the towers had customarily discharged their ashes there. It was the presence of the highly inflammable matter, for which the defendant was responsible, that changed the situation and brought about the fire.

In support of its contention, the defendant relies largely upon the decision of Judge Mayer of the District Court for the Southern District of New York, in the case of The Lusitania, 251 F. 715, 732. That was a petition in admiralty brought by the Cunard Steamship Company, Limited, the owner of the Lusitania, to obtain an adjudication of the question of liability and to limit its liability to its interest in the vessel and pending freight should the court find that it was liable for the loss of 1,195 lives out of a total of 1,959 passengers and crew on board her at the time the vessel was, without warn-

ing, torpedoed and sunk within eighteen minutes thereafter.

As to the liability of the boat for the destruction of the lives in question, it was contended on the part of those seeking damages that Captain Turner of the Lusitania was negligent in not literally following the admiralty advices which he had received in regard to the presence of German submarines and the course, manner, and speed he should pursue in going to Liverpool, and in not taking a course different from the one adopted. In considering this matter, the court found as a fact that the captain was not negligent. The court then assumed that the captain was negligent for the purpose of discussing whether his negligence was the proximate cause of the loss or damage. In considering that question, it stated "that, even if negligence is shown, it cannot be the proximate cause of the loss or damage, if an independent illegal act * * * intervenes to cause the loss." It then points out that, under well-recognized rules of international law, it was an illegal act for the German submarine officers to destroy the vessel without first warning her of their purpose to do so and allowing the persons on board to disembark, and that, in view of this rule, the master of the Lusitania, if negligent in the course he pursued, was not bound to anticipate the destruction of the lives on board without affording them an opportunity to disembark.

In that case it must be borne in mind that the court, in passing on the question of what the master was bound to anticipate, was deciding questions of fact as well as making rulings of law; that under the facts there found, those in charge of the submarines knew that the Lusitania was a passenger liner carrying American citizens as well as those of other nations, and that their attack upon and destruction of her "was deliberate and long contemplated, and [thereby they] intended ruthlessly to destroy human life as well as property." In other words, that the submarine officers who blew up the Lusitania did so willfully, intending to destroy the lives of those on board.

It would seem that on the facts in that case, and irrespective of a violation of the rule of international law, the willful and intentional destruction of those lives was, as a matter of law, the direct, immediate, and sole cause. Ela v. Cable Company, 71 N. H. 1, at page 4, 51 A. 281. The cause is clearly distinguishable from the one before us. The terminal company and its employees did not know or were not found to have known of the presence of the inflammable matter under the wharf, which the defendant, through its negligence, had caused to be there. Their act in discharging the ashes was not willfully done or found to have been willfully done with the intention of setting the inflammable matter on fire, as were the acts of the German submarine officers, for they were found to have willfully intended to destroy the lives of those they knew were on board. The District Court or this court cannot, in a law case, usurp the functions of the jury and pass on facts as well as law.

What is the proximate cause of a loss or injury is, as a rule, a question of fact, and the chief fact to be determined, where a third party intervenes, is what, under the circumstances of the particular case, a reasonable, prudent man, standing in the shoes of the negligent wrongdoer, should have anticipated as a consequence of his wrongdoing. Ela v. Cable Company, 71 N. H. 1, 3, 4, 51 A. 281. If he should have anticipated the happening of a class of acts of which that that ensued is one, his negligent act is or may be found to be a proximate cause. If there is any legal qualification of the rule, other than the one of a failure of proof, it would seem to be where the third party, fully aware of the situation created by the negligent act of the defendant, willfully and intentionally intervenes. In such case it may be that, as a matter of law, he is to be regarded as the sole and efficient cause of the resulting wrong or injury; and probably the same legal effect would follow where the intervening third party, fully aware of the situation produced by the defendant's negligence, carelessly, not caring, intervenes, which in law is the legal equivalent of a willful or intentional wrong.

But, however this may be, I am of the opinion that in this case, as heretofore pointed out, there was evidence from which it could be found that the defendant's negligence was not a mere condition but was a subsisting and concurring cause at the time of the breaking out of the fire, and that the court erred in not submitting the case to the jury.

Counsel for the gas company in their brief and argument seem to lay special stress upon that clause of the lease from the terminal company to the respective plaintiffs wherein it is provided that the lessee "covenants and agrees to take upon itself all risk of loss by fire to the contents of the building, etc.," and in the majority opinion of this

court that clause is quoted as though it had some special bearing on the issue of liability as between the plaintiffs and the gas company. I fail to see what bearing it has upon that question other than to create bias and prejudice in the minds of the jury and perhaps of the court. It surely has no legitimate bearing on the question of liability between the parties here involved, and it is even questionable, inasmuch as the covenant undertakes to relieve the terminal company of liability for its future negligence, if that company were the party defendant, whether the covenant would not be invalid as against public policy.